**REIMAN & COMPANY, Plaintiff,**

**v.**

**EROMANGA INVESTMENTS, N.V., Defendant.**

**Civ. A. No. 83–3715.**

United States District Court, District of Columbia.

Jan. 14, 1985.

Christopher Sanger, Washington, D.C., for plaintiff.

Richard A. Hibey, Washington, D.C., for defendant.

**MEMORANDUM**

GASCH, District Judge.

This action was tried to the Court on September 26 and 27, 1984. Plaintiff and defendant waived a jury trial just prior to the start of the trial. The Court has considered the testimony and exhibits introduced in evidence during the trial as well as the memoranda submitted by the parties following the trial[1] and issues this memorandum setting forth its findings of fact and conclusions of law.

Plaintiff Reiman & Company is a District of Columbia limited partnership. Richard Reiman, its sole general partner, is licensed as a real estate broker in the District of

---

**1.** At the Court's request, counsel for plaintiff and defendant submitted proposed findings of fact and conclusions of law after the conclusion of the trial.

Columbia. Trial Transcript ("T."), testimony of Richard A. Reiman at 72, 73. Eromanga Investments, N.V. (hereinafter "Eromanga") is a Netherlands Antilles corporation named as a defendant individually and as the sole partner of defendant Connecticut Inn Partnership ("CIP").[2] The Court has jurisdiction over the defendant pursuant to D.C.Code § 13–423(a)(1), (5). Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332.

Plaintiff alleges that defendant Eromanga is liable for breach of a real estate commission agreement with regard to the Connecticut Inn Partnership's sale of the Connecticut Inn, a hotel located in Washington, D.C., to Van Ness Limited Partnership ("VNLP")[3] on November 1, 1983. Al-

ternatively, plaintiff seeks compensation on a *quantum meruit* basis for services he alleges he performed in connection with this sale.

Richard Reiman's interest in the sale of Connecticut Inn began in June, 1981 when he passed the hotel and noted a "for sale" sign on the premises.[4] T. at 73–74 (Reiman). Reiman was first authorized to act as a real estate broker on behalf of the Connecticut Inn Partnership with regard to this property in July, 1981. T. at 74–75 (Reiman) and 11–12 (testimony of Bruce D. Lyons). Reiman received this authorization from Bruce D. Lyons, President of Holland & Lyons Properties,[5] which at the time was the managing general partner responsible for the operation of the Con-

2. The Connecticut Inn Partnership was established in 1979 to acquire and operate the Connecticut Inn, located at 4400 Connecticut Avenue, N.W., Washington, D.C. Originally, CIP had four partners: 1) Holland and Lyons Properties, Inc. ("Holland & Lyons"); 2) R & D Management Company; 3) 4400 Connecticut Avenue Associates; and 4) Eromanga. On February 25, 1983 Eromanga exercised certain buyout rights contained in the partnership agreement and purchased the partnership interests of Holland & Lyons and R & D Management Company. In October, 1983, Eromanga became the sole partner in the Connecticut Inn Partnership by purchasing the interest of 4400 Connecticut Avenue Associates. *See* Undisputed Facts (hereinafter "Stipulated Facts") printed in Magistrate's Pretrial Report at 1–2.

3. The two general partners of Van Ness Limited Partnership are business trusts created, owned and controlled by Neil T. Coakley and Frederick G. Williams. These trusts also own the majority interest in VNLP. *See* T. at 167 (Williams). Messrs. Coakley and Williams apparently operate their business affairs as controlling shareholders of Coakley & Williams, Inc. ("Coakley & Williams"). *See* T. at 151 (Williams). In addition to calling Mr. Williams as a witness, plaintiff also called Mr. Brian Coakley, an executive with the Coakley & Williams firm.

The remaining interest in the Van Ness Limited Partnership is owned by the Connecticut Inn Partnership which serves as a limited partner in VNLP. Although the deal with Coakley & Williams and VNLP was structured as a joint venture, it is clear that it constituted a "sale" of the Connecticut Inn property. *See* Stipulated Facts (all fee and leasehold interests of CIP "sold and conveyed" to VNLP); *see also* Plaintiff's Exhibits No. 39, 40, and 43.

4. The Connecticut Inn Partnership apparently decided to sell the Connecticut Inn almost immediately after it acquired the hotel in 1980. In September, 1980 CIP entered into a sale contract with Redwal Partners but in March 1981, the deal failed to close. T. at 6–7 (Lyons). The property was placed back on the market thereafter.

The history of CIP's ownership of the Connecticut Inn is characterized by a continuing decline in the property's physical and financial well-being. For example, by the summer of 1981 two of the five floors that contained guest rooms had been closed and the hotel's cash flow was becoming "increasingly inadequate to cover the operating expenses." T. at 14 (Lyons). By early 1983, the situation had deteriorated to the point that Lyons characterized it as being "desperate." The hotel was being threatened with a tax sale because of the failure to pay real estate taxes. T. at 35–36 (Lyons). On February 10, 1983, the mortgagee that had financed CIP's purchase of the hotel, issued a notice of foreclosure. T. at 229 (Precup). The failure of Holland & Lyons to cure the default on the mortgage allowed Eromanga to exercise its right to buy out Holland & Lyons' interest in the Connecticut Inn Partnership. T. at 230 (Precup).

5. Robert Holland, a witness for the defendant, was secretary of Holland & Lyons but not active in Holland & Lyons after March, 1981. *See* T. at 6 (Lyons). Indeed, even defendant's principal witness, Eromanga's attorney-in-fact, testified that most of his dealings were with Bruce Lyons and that Holland was involved in dealing with Eromanga only on "rare occasions." T. at 226–27 (testimony of Ronald G. Precup). Accordingly, the Court found Holland's testimony to have little value.

necticut Inn Partnership.[6] Lyons testified that he had agreed, on behalf of the Connecticut Inn Partnership, that Reiman was to receive a commission of $200,000 in cash at closing in the event of a sale of the Connecticut Inn "[t]o anybody that Mr. Reiman was able to procure" or if Reiman & Company procured an acceptable joint venture partner to operate the hotel with the Connecticut Inn Partnership or any of its partners. T. at 12–13 (Lyons).[7] This commission agreement was not reduced to writing.[8] *Id.* at 14 (Lyons) and 123 (Reiman). Lyons testified that this basic agreement remained in effect at all times when the property was on the market through February 25, 1983, when Holland & Lyons Properties was removed as managing partner of the Connecticut Inn Partnership. T. at 15 (Lyons).

The existence of such an oral commission agreement represented one of the most hotly disputed issues at trial. Counsel for Eromanga relied on a number of arguments in an attempt to undercut the testimony of Lyons and Reiman that they had entered into an oral agreement on behalf of their principals in July 1981. For example, defendant relies on the existence of other written agreements between the parties regarding other prospective purchases of the Connecticut Inn as well as Reiman's own statements concerning the value of written agreements to support its contention that no oral agreement existed. In addition, defendant attempted to discredit Lyons' testimony that he entered into an agreement with Reiman by arguing that Lyons was not a disinterested witness since Lyons admitted that he expected to receive a portion of the proceeds of plaintiff's recovery in this litigation[9] and Reiman characterized Lyons as a "friendly acquaintance" of his. T. at 131 (Reiman).

The decision as to whether or not to accept the testimony of Lyons and Reiman on the existence of an oral commission agreement ultimately requires the Court as the finder of fact in this action to assess the credibility of these witnesses.[10] Of course, as counsel for defendant points out, the existence of a pecuniary interest is one factor that may indicate that a witness' testimony should not be credited by the

6.  Holland & Lyons Properties' responsibilities as managing general partner included responsibility for directing efforts to sell the hotel on behalf of the Connecticut Inn Partnership.

    Holland & Lyons served as managing general partner of the Connecticut Inn Partnership from the formation of CIP through February 25, 1983 when Eromanga terminated its interest in CIP by exercising its buy-out rights. *See* T. at 7–8 (Lyons).

7.  Lyons also testified that this figure was arrived at based on his estimate of a possible sale price. Thus the fixed fee of $200,000 represented five percent of a $4 million sale price and four percent of a $5 million sale price. T. at 13 (Lyons).

8.  There is no requirement that a commission agreement be in writing. *See Apostolides v. Colecchia,* 221 A.2d 437 (D.C.1966). Lyons and Reiman did testify, however, that there were subsequent agreements negotiated on a case-by-case basis varying their basic agreement and providing for Reiman to receive a lower commission if the hotel were sold to specified individuals at a lower price than that the CIP partners had hoped to receive. These agreements were in writing. *See* Defendant's Exhibits E, F, and O. According to Lyons and Reiman, no such subsequent agreement was negotiated with

regard to any sale to the Coakley & Williams interests. T. at 15–16 (Lyons) and 129 (Reiman).

Lyons and Reiman also negotiated a subsequent written brokerage agreement which provided for Reiman & Company to have the exclusive right to serve as broker during a six month period beginning in September, 1981. However, that agreement was not renewed and plaintiff does not claim that this agreement serves as the basis for any recovery in this action. T. at 124, 128 (Reiman).

9.  Both Reiman and Lyons testified that Lyons had allowed Reiman to use offices rented by one of Lyons' companies, Cirrus Investment Corporation, and certain office facilities from June 1981 until March 1982. T. at 9–10 (Lyons) and 131 (Reiman). Lyons testified that Reiman had promised to compensate Lyons by paying him 25 percent of any recovery Reiman & Company might receive in this action. T. at 66, 67 (Lyons).

10.  There is no indication in the record that anyone besides Lyons and Reiman was present when Reiman and Lyons met in July 1981 to discuss the terms of any agreement between the Connecticut Inn Partnership and Reiman & Company.

finder of fact. Similarly, in some cases it is appropriate to draw inferences regarding the claim of reliance on an oral agreement where the parties have seen fit to reduce other agreements to writing. However, a determination as to the credibility of a witness is not a mechanical inquiry in which his sworn statements must always be disregarded in the presence of such factors. Rather it requires consideration of a wide variety of indicia of credibility including the demeanor of the witness, the extent to which a witness' testimony is consistent with the other evidence in the case, and the existence of evidence which rebuts that evidence offered to impeach a witness.[11] After consideration of all these indicia of credibility and the evidence as a whole, the Court finds the testimony of Lyons and Reiman as to their having entered into an oral commission agreement entitling Reiman & Company to a $200,000 fee if it procured a buyer or joint venture partner for the Connecticut Inn to be credible. The Court finds its own observations as to the demeanor of Lyons and Reiman to be especially persuasive in making this determination.[12]

Between July 1981 and February 1983, Reiman engaged in extensive efforts to find a purchaser for the Connecticut Inn. On two occasions he was successful in securing contracts from prospective buyers but in neither case did the deal close.[13] During periods when the hotel was not taken off the market in ultimately futile efforts to close these two deals, plaintiff attempted to interest the Coakley & Williams group in acquiring the Connecticut Inn. It is the extent and significance of those efforts directed at Coakley & Williams that was the second hotly disputed issue at trial.

Reiman first contacted Coakley & Williams with regard to the Connecticut Inn in August, 1981 when he telephoned Fred Williams, president of Coakley & Williams. T. at 76–77 (Reiman) and 157–59 (Williams). This contact represents the first time that Coakley & Williams became aware that the Connecticut Inn was for sale. T. at 157 (Williams). Immediately after that call, Reiman met with Brian Coakley, then manager of Coakley & Williams' hotel division or vice president of marketing, on August 19, 1981 to provide Coakley & Williams with further information on the hotel. T. at 77–78 (Reiman) and 180–81 (Brian Coakley).[14] At that time, Reiman presented Coakley & Williams with a detailed invest-

11. Indeed, that the Federal Rules of Evidence contemplate such a wide-ranging inquiry in determining a witness' credibility is evident in the wide variety of types of evidence allowed with regard to this issue. *See, e.g.,* Fed.R.Evid. 607 (credibility of witness may be attacked by any party, including party calling him); 608(a) (witness' credibility may be attacked by reputation and opinion evidence as to character of witness for truthfulness); 608(b) (trial court, in its discretion, may allow use of extrinsic evidence of conduct of a witness for purpose of attacking or supporting his credibility); 609 (authorizing impeachment of witness' credibility by evidence of conviction of certain crimes).

12. The Court finds unpersuasive Eromanga's reliance on Exhibits E, F, and O to argue against the existence of an oral agreement. The Court was instead persuaded by the testimony of Lyons and Reiman that such written agreements were used to vary the terms of the basic oral agreement when it became clear that a contract with a likely purchaser would otherwise be financially unacceptable to the Connecticut Inn Partnership. *See* T. at 67–69 (Lyons). While it may be that the Connecticut Inn Partnership would have attempted to enter into an agreement lowering the commission in connection with the Coakley & Williams deal if Reiman & Company had been recognized as the procuring broker by the CIP, no such agreement varying the basic rate was in fact entered into regarding Coakley & Williams. Indeed, after taking over as managing partner, Eromanga agreed to pay the broker it retained $200,000 as "that was [the price] on the street." T. at 302 (Precup).

13. In October, 1981 Reiman & Company procured a contract from JNC Enterprises but that contract failed to settle in April, 1982. T. at 24–25 (Lyons). Later in 1982 Reiman was successful in soliciting a contract from International Hospitality Group ("IHG") but that deal failed to close in January, 1983. T. at 33–34, 36 (Lyons).

14. Reiman was scheduled to have met with Fred Williams on that date. However, Williams apparently missed the meeting because of a scheduling error on his part. T. at 181 (Brian Coakley).

ment brochure which included a description of the property, floor maps, estimates as to the cost of required renovation work, and location maps detailing offices and other facilities in the area. *See* T. at 78–80 (Reiman) and 182 (Brian Coakley); *see also* Plaintiff's Exhibit No. 5. Brian Coakley promised to relay the information Reiman had provided to Fred Williams. T. at 184 (Brian Coakley).

On September 2, 1981, Reiman met with Fred Williams and took him on a thorough inspection of the hotel. T. at 81–82 (Reiman) and 157 (Williams).[15] This tour represented the first time that representatives of the Coakley & Williams group saw the Connecticut Inn. T. at 157 (Williams).

Reiman followed up on the September 2, 1981 meeting by sending a letter encouraging Coakley & Williams to submit a contract. *See* T. at 82–83, Plaintiff's Exhibit No. 4. Reiman also made several calls to Fred Williams to push the project. T. at 158–59 (Williams). Later that month, Reiman returned to Coakley & Williams and met with Fred Williams a second time, this time giving him a memorandum responding to certain questions about the project he had been unable to answer earlier. *See* T. at 87–88 (Reiman), Plaintiff's Exhibit No. 6. That same month Reiman met with Williams a third time to give Williams a contract. T. at 88–89 (Reiman). During the latter part of September, Reiman met with Williams at the Connecticut Inn and this time Neil Coakley was present. T. at 90 (Reiman). This visit represented the first time Neil Coakley had seen the Connecticut

Inn. *Id.* As part of this meeting, Reiman drove Neil Coakley and Fred Williams around the area surrounding the hotel, pointing out features of the area that might represent sources of business for the hotel. *Id.* at 91.

Despite his efforts, Coakley & Williams did not submit a contract prior to the Connecticut Inn Partnership's receipt of the JNC offer in October, 1981. Instead, in early October, Reiman received a letter from Brian Coakley informing him that because of other "projects and commitments" then underway, Coakley & Williams was unable to "devote the time and study necessary" to consider the matter further at that time. However, Coakley's letter also advised Reiman that Coakley expected to pursue the matter further as soon as the firm's work load had lessened. Coakley reassured Reiman to "[r]est assured that when that time is available, I will call you...." Plaintiff's Exhibit No. 8, Defendant's Exhibit R; *see also* T. at 95–96.[16]

Following the failure of the JNC Enterprises deal, the Connecticut Inn was again placed on the market.[17] Reiman again set out to interest Coakley & Williams in the Connecticut Inn. T. at 32–33 (Lyons) and 99 (Reiman). Reiman again wrote Brian Coakley and repeatedly attempted to call Fred Williams about the hotel. T. at 99–101 (Reiman), Plaintiff's Exhibit No. 11. Reiman stressed that the Connecticut Inn Partnership's asking price had already fallen considerably below the $5 million Reiman had told Coakley & Williams that CIP was seeking in 1981. *Id.* Reiman was

---

**15.** Brian Coakley may also have been present. Reiman testified that Coakley attended the meeting on September 2, 1981. T. at 81. Brian Coakley himself did not recall touring the hotel with Reiman at that time. T. at 184 (Brian Coakley).

**16.** Although Fred Williams testified that he had told Reiman in this period that Coakley & Williams was not interested in the Connecticut Inn, T. at 175, Neil Coakley's letter to Reiman indicates no such lack of interest. At a minimum, the letter gave Reiman cause to believe that Coakley & Williams might be interested in acquiring the hotel at a later point and thus prompted him to continue his efforts when the

hotel again became available. *See also* T. at 179 (Williams).

**17.** After the JNC sale had failed to close, Bruce Lyons specifically authorized Reiman & Company to reactivate its efforts to locate a buyer for the Connecticut Inn pursuant to the same basic commission agreement they had established in July, 1981. T. at 26 (Lyons). Reiman confirmed this arrangement by letter to Holland & Lyons on April 7, 1982. T. at 27–28 (Lyons), Plaintiff's Exhibit No. 12. That letter also "registered" fourteen prospective purchasers Reiman had procured for the partnership as clients. T. at 28–29, 31 (Lyons).

again told that the Coakley & Williams firm was "extraordinarily busy" and therefore could not consider the matter at that time. T. at 101 (Reiman). Reiman made one final effort to interest Coakley & Williams by phone in July of 1982 just before International Hotel Group submitted a contract but was again told that the press of other business made it impossible for Coakley & Williams to devote the time needed to consider the matter. T. at 105–06 (Reiman).

Following the failure of the IHG deal, the Connecticut Inn was placed back on the market a final time. Reiman testified that he wrote Brian Coakley a letter on January 19, 1983 in a renewed effort to spark Coakley & Williams' interest in the Connecticut Inn. T. at 108–09 (Reiman), Plaintiff's Exhibit No. 22.[18] Reiman also testified that he called a Coakley & Williams official[19] to follow up on the letter. T. at 110–11 (Reiman). Reiman's January call to Coakley & Williams apparently marked the end of his role in efforts to interest Coakley & Williams in the property. On February 22, 1983, Eromanga wrote Reiman to notify him that Reiman & Company's authority to serve as a broker for the Connecticut Inn Partnership had been terminated. See T. at 171–72 (Precup) and Plaintiff's Exhibit No. 44. Eromanga apparently took this action to revoke Reiman's authority in anticipation of its decision to exercise its buyout rights and become managing general partner of the Connecticut Inn Partnership as of February 25, 1983. Eromanga barred Reiman & Company from playing any role in subsequent negotiations with Coakley & Williams. T. at 261–62 (Precup). All remaining contacts between the Connecticut Inn Partnership and the Coakley & Williams interests[20] occurred through Eromanga as managing partner of CIP, T. at 260 (Precup), or through Calvin Frey, the broker who ultimately received a commission for the sale of the Connecticut Inn.[21]

Although Reiman & Company has consistently maintained that it is entitled to the broker's commission with regard to the sale of the Connecticut Inn,[22] Eromanga,

---

**18.** Brian Coakley testified that he received no letter from Reiman during this period. T. at 194–95 (Brian Coakley). This testimony bars reliance on the evidentiary presumption that the letter was received established by virtue of Reiman's testimony that the letter was properly addressed, stamped and mailed and raises a question of fact as to whether or not the letter was received. See, e.g., Legille v. Dann, 544 F.2d 1, 4–7 (D.C.Cir.1976). However, regardless of whether or not the letter was received there can be no question that Reiman made a significant effort to procure a contract from Coakley & Williams in this period. Indeed, Reiman's testimony that he called Coakley & Williams shortly after January 19, 1983 was uncontradicted. The Court can also infer from the voluminous evidence that Reiman had repeatedly solicited Coakley & Williams after the Connecticut Inn returned to the market that he did so after the JHG contract fell through. This finding is consistent with the Court's view that Reiman had an unwavering belief throughout his tenure as broker for the Connecticut Inn that Coakley & Williams were among the hotel's most likely buyers.

**19.** Reiman could not recall whether he spoke with Fred Williams or Brian Coakley. T. at 111 (Reiman).

**20.** Coakley & Williams participated in extensive negotiations which culminated in Van Ness Limited Partnership's acquisition of the property on November 1, 1983. T. at 260–61 (Precup) and 167 (Williams).

**21.** Frey first contacted Fred Williams about the Connecticut Inn on February 16, 1983. T. at 159–61 (Williams). On February 24, 1983, Frey and Precup met with Coakley & Williams officials to discuss the Connecticut Inn. T. at 270–71 (Precup). However, Frey had no authority to act as a broker for the Connecticut Inn Partnership until February 25, 1983 when Eromanga became managing general partner and gave Frey this authorization. T. at 272–73, 274 (Precup). The letter authorizing Frey specified that Frey would be paid a $200,000 broker's commission if the deal with Coakley & Williams were consummated. See Plaintiff's Exhibit No. 27. Precup testified that Eromanga initially agreed to pay this amount as that was the price "that was on the street." T. at 302 (Precup). The Connecticut Inn Partnership ultimately entered into a subsequent commission agreement with Frey limiting his commission to $140,000. T. at 302–04 (Precup).

**22.** After learning of Frey's involvement from Lyons on February 18, 1983, Reiman wrote a letter to Lyons (who was responsible for directing the affairs of the Connecticut Inn Partnership until February 25, 1983) asserting that Reiman & Company was entitled to a $200,000

acting on behalf of the Connecticut Inn Partnership, has refused to make any such payment to Reiman & Company. *See* T. at 118 (Reiman).

Because the Court has found that Lyons (on behalf of Reiman & Company) entered into a valid nonexclusive oral commission agreement,[23] plaintiff's effort to recover pursuant to that agreement turns on whether Reiman & Company was the "procuring cause" of the sale of the Connecticut Inn that occurred on November 1, 1983.[24] *See, e.g., Frey v. Chastain,* 412 A.2d 1185, 1187 (D.C.1980); *Sam Blanken & Co. v. Tinos Inc.,* 219 A.2d 499, 500 (D.C.1966) ("It is well settled that a broker cannot recover a commission under an ordinary brokerage agreement unless he was the procuring cause of the sale."). The determination as to whether a broker is the procuring cause of a transaction is one of fact, *id.,* and one which requires the fact finder to consider all aspects of the broker's role. *See, e.g.,* 12 Am.Jur.2d *Brokers* § 190 at 931 ("The question as to when a broker may be considered the procuring cause of a sale depends, in the main, upon the particular facts and circumstances of each case...." (citations omitted)). Although courts have utilized a variety of formulations in efforts to express the requirement that the broker's actions must have been the predominating cause of the transaction,[25] it is apparent that there is no single litmus test for resolving this question that can be applied to all cases. For example, courts have characterized the question of who "first introduced" the eventual purchaser to the seller as a "significant" factor in determining whether a broker was a procuring cause of a deal but have cautioned that this question alone is not determinative. *See Park Road Housing Co. v. Adas Israel Hebrew Congregation,* 225 F.2d 28 (D.C.Cir.1955); *Battle v. Price,* 72 F.2d 377, 378 (D.C.Cir.1934). In fact, courts have in some instances concluded that brokers met the procuring cause requirement notwithstanding the fact that the brokers did not inform the buyer about the availability of the property, did not participate in negotiations toward the purchase, and did not even meet the buyer. *See* 12 Am.Jur.2d, *supra,* at 933 & nn. 9–11. Again this does not mean that these and other factors that might be envisioned are not significant but only that their presence or absence is not necessarily dispositive.[26]

■ After consideration of the evidence concerning the sale of the Connecticut Inn, the Court finds that Reiman & Co. was the procuring cause of the Connecticut Inn Partnership's deal with the Coakley & Williams interests. The Court notes a number of factors supporting this finding. Reiman was the first broker to alert Coakley & Williams that the Connecticut Inn was for sale, the first broker to set up meetings

---

commission in the event of a deal with Coakley & Williams. Precup was sent a copy of this letter. *See* T. at 38–40, 61 (Lyons), 112–13 (Reiman), and Plaintiff's Exhibit No. 25.

**23.** That agreement remained in force through February 25, 1983, when Eromanga became managing general partner and first had lawful authority to revoke Reiman & Company's authority to market the Connecticut Inn. Eromanga's actions in revoking Reiman & Company's authority at that time did not in any way affect any commission right that had accrued on the basis of work performed prior to February 25, 1983.

**24.** There is no indication that Lyons and Reiman varied the typical brokerage agreement to require anything less than that Reiman & Company meet this requirement to be entitled to a commission.

**25.** *See, e.g.,* 12 C.J.S. *Brokers* § 166 at 519, 521–24 (terms "procuring cause," "efficient cause," and "proximate cause" used interchangeably in context of brokers' commissions).

**26.** Decisions delineating the procuring cause requirement in the context of District of Columbia law have repeatedly demonstrated the need for this flexible determination of the factors that might bear on a broker's role in procuring a deal. *See, e.g., Park Road Housing Co., supra; Bergman v. Gitelson & Neff Associates,* 267 A.2d 360, 362 (D.C.1970) (recognizing plaintiff as procuring broker notwithstanding fact that ultimate sale through second broker was for price below that first broker was authorized to charge).

between Coakley & Williams officials and officials of the Connecticut Inn Partnership,[27] and the first broker to take Coakley & Williams officials through the property. Reiman zealously pursued the possibility of a deal with Coakley & Williams at each point at which the property was on the market. Indeed, Reiman's efforts were so extensive in this regard that Brian Coakley characterized Reiman as a "nuisance"[28]—a characterization that might be read as indicating the extent to which Coakley & Williams had come to equate the possibility of acquiring an interest in the Connecticut Inn with Reiman's advocacy of this acquisition. When the hotel was placed on the market for the final time in early 1983, Reiman again solicited Coakley & Williams, informing them again as he had on prior occasions of the continuing decline in the purchase

price and of other changes that increased their interest in the property. T. at 100–01 (Reiman).[29] Although Reiman was not involved in negotiations held after February 25, 1983, this resulted from Eromanga's decision to exclude Reiman and not from any abandonment by Reiman. *See Lady v. Realty Associates*, 31 A.2d 875, 876 (D.C. Mun.App.1954).[30] The Court also believes it to be significant that the written materials Frey presented to Coakley & Williams were originally prepared not by Frey but by Reiman.[31]

■ Thus the Court finds that plaintiff Reiman & Company fully performed the requirements of the commission agreement with the Connecticut Inn Partnership. By the terms of that agreement, the $200,000

---

27. Bruce Lyons attended a number of meetings on behalf of the Connecticut Inn Partnership with Coakley & Williams that were set up by Reiman. *See, e.g.,* T. at 78 (Reiman) and 180–81 (Brian Coakley).

28. T. at 184–85 (Brian Coakley).

29. Although Reiman's efforts had failed to result in Coakley & Williams' submitting a contract prior to Reiman's discharge, there seem to have been two obstacles to Coakley & Williams' pursuing the matter that had diminished by January, 1983. First, the earlier efforts to interest Coakley & Williams had coincided with periods when the firm's time and attention were focused on other pending deals. Coakley & Williams officials stressed this point repeatedly, particularly in Brian Coakley's 1981 letter to Reiman. *See* Defendant's Exhibit R. Second, Coakley & Williams had considered the hotel's price to be prohibitive. Reiman had initially attempted to sell the hotel for $5 million. (Although Williams remembers the original price as $7 million, T. at 158 (Williams), this amount seems to include the cost of necessary renovation.) By early 1983, the IHG deal which had a price of $4.3 million had fallen through, T. at 34 (Lyons), the hotel's financial condition was desperate, and the Partnership had given up hopes of achieving a profit. Reiman informed Coakley & Williams the hotel was available at a lower price than was the case prior to the IHG contract. Coakley & Williams ultimately acquired its interest in the Connecticut Inn at a price that placed the hotel's value at approximately $4.1 million. T. at 178 (Williams).

30. In this as well as other respects, the instant case is analogous to *O'Brien v. Morgan*, 104 A.2d

411, 413 (D.C.Mun.App.1954), where the Court stated that "when a seller excludes the broker from the negotiations, or orders him to cease dealing with the purchaser, he cannot deprive him of his commission if a sale is made."

31. Frey admitted in his deposition that he had had no part in preparing any part of these materials. T. at 351–52 (excerpt from Frey deposition). Reiman identified the materials in question as the materials he had prepared. T. at 358–60 (Reiman); *see also* T. at 78–80, Plaintiff's Exhibits No. 36 and 37.

Defendant attempted at trial to undercut the evidence set forth above indicating Reiman's role as the procuring broker by arguing that the deal the Coakley & Williams firm eventually reached with Eromanga (acting for CIP) was a different deal than those Reiman had attempted to procure. However, the evidence is clear that, contrary to Eromanga's suggestions, Reiman had repeatedly suggested to prospective buyers including Coakley & Williams that a deal for the Connecticut Inn could be structured as a joint venture and that such a joint venture could be set up with any of the partners involved in the Connecticut Inn Partnership. T. at 19–20 (Lyons), 80 (Reiman), 183–84 (Brian Coakley). Although Eromanga makes much of the fact that Coakley & Williams was not interested in a joint venture with Holland & Lyons, Reiman did not limit himself to encouraging joint ventures with Holland & Lyons. In fact, on at least one occasion he drew up a contract providing for one of his prospects to enter into a joint venture with Eromanga. T. at 103–04 (Reiman); *see also* Plaintiff's Exhibit No. 19. This took place prior to Eromanga's becoming the managing general partner.

commission [32] became due and payable in cash on November 1, 1983 when the transaction with Coakley & Williams closed. The measure of damages for breach of this commission agreement is the full amount of the agreed-upon commission, plus interest from the date of closing. D.C.Code § 15–109; [33] *Bradley, Beall & Howard v. Miller,* 128 F.2d 320, 321 (D.C.Cir.1942); *Giant Food, Inc. v. Jack I. Bender & Sons,* 399 A.2d 1293, 1305 (D.C.1979); *Crifasi v. Harris,* 163 A.2d 571 (D.C.Mun.App.1960).

Because of the resolution of plaintiff's breach of contract claim, the Court need not reach plaintiff's effort to recover compensation on a *quantum meruit* basis.

### ORDER

Upon consideration of the trial to the Court held on September 26 and 27, 1984 and of the proposed findings of fact and conclusions of law submitted by plaintiff and defendant, it is by the Court this 11th day of January, 1985,

ORDERED that judgment be, and hereby is, entered for plaintiff and against defendant in the amount of Two Hundred Thousand Dollars ($200,000.00) plus interest at the rate of 7.7 percent per annum from November 1, 1983 on plaintiff's breach of contract claim for the reasons set out in the accompanying memorandum. Because of the resolution of this claim, the Court need not reach plaintiff's alternative *quantum meruit* claim.

---

**32.** *See supra,* note 12.

**33.** The general rule in actions for breach of contract is that interest is only available from the date of a judgment finding such breach. However, D.C.Code § 15–109 authorizes the Court to award prejudgment interest where, as here, the Court finds such interest to be necessary in order to compensate the plaintiff fully. *See Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 550 n. 6 (D.C.1981). The rate for such interest is set by law at 7.7 percent per annum. *See* D.C.Code §§ 15–108, 28–3302(c); 28 U.S.C. § 6621; Fed.Tax Rptr. (CCH) ¶ 5519k.01 & 6477 "New Matters."