COMMITTEE OF BLIND VENDORS
OF THE DISTRICT OF
COLUMBIA, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, et
al., Defendants.

Civ. A. No. 88–0142–OG.

United States District Court,
District of Columbia.

April 17, 1990.

Robert R. Humphreys, Humphreys & Mitchell, Washington, D.C., for plaintiffs and the class.

Domenique Kirchner and Greg Lewis, Asst. Corp. Counsel, Herbert O. Reid, Sr.,

Corp. Counsel, Martin L. Grossman, Deputy Corp. Counsel, and Cary Pollack, Chief, General Litigation III, Corp. Counsel's Office, on the briefs, for defendants.

## MEMORANDUM

GASCH, Senior District Judge.

This is a class action lawsuit brought by blind vendors and their representatives against the District of Columbia Rehabilitation Services Administration and other District of Columbia agencies. Plaintiffs claim that defendants have mismanaged the District's Randolph–Sheppard program to the detriment of plaintiffs and the class. Plaintiffs seek a writ of mandamus to compel defendants to adhere to the Randolph–Sheppard Act, and damages of more than $800,000 for breach of contract.[1]

On October 7, 1988, the Court denied defendants' motion to dismiss or, in the alternative, for summary judgment. The Court rejected defendants' arguments, holding that plaintiffs had standing and were not barred from seeking relief in a judicial forum for failure to exhaust their administrative remedies. *Committee of Blind Vendors v. District of Columbia,* 695 F.Supp. 1234, 1237–40 (D.D.C.1988). The Court also held that monetary damages were available to aggrieved vendors under the Randolph–Sheppard Act, and rejected defendants' argument that plaintiffs' claims were improper since the named agencies had the sole discretion to allocate agency resources. *Id.* at 1240–42. Finally, the Court concluded that this action met the requirements of Federal Rule of Civil Procedure 23(b)(3) and that a class action was appropriate. *Id.* at 1242–44.

Following an allowance of time for discovery and other pretrial matters, the Court held a five-day bench trial from December 18 to December 22, 1989. Approximately 175 exhibits comprising many hundreds of pages were received into evidence. The most significant exhibits consisted of financial audits, program compliance reviews, and correspondence between the

blind vendors and the agencies. On February 8, 1990, the parties submitted their proposed findings of fact and conclusions of law. Upon consideration of the testimony of the witnesses at trial, the exhibits filed with the Court, and the entire record herein, the Court has now made its findings of fact and conclusions of law. Before elaborating these findings, however, it is necessary first to outline in broad contours the relevant provisions of the Randolph–Sheppard Act and the nature of plaintiffs' claims.

## I. THE STATUTORY FRAMEWORK

The Randolph–Sheppard Vending Stand Act, 20 U.S.C. §§ 107–107f ("the Act"), was first enacted in 1936. Its purpose was to provide employment opportunities on federal property to blind vendors, to afford them self sufficiency, and to further federal rehabilitative efforts on their behalf. 20 U.S.C. § 107(a); H.R.Rep. No. 1094, 74th Cong., 1st Sess. 2 (1936); S.Rep. No. 937, 93d Cong., 2d Sess. 5 (1974). The Act was twice amended, in 1954 and 1974. As several courts have chronicled, Congress intended through these amendments to strengthen the Act in several important respects and to confer on the blind vendors legally enforceable rights. *Texas State Comm'n for the Blind v. United States,* 796 F.2d 400, 402–03 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987); *Delaware Dep't of Health and Social Servs. v. United States Dep't of Educ.,* 772 F.2d 1123, 1126–31 (3rd Cir.1985).

For the purposes of this lawsuit, several broad aspects of the Randolph–Sheppard program are relevant. First, the Act authorizes blind persons to operate vending facilities on federal property, and requires that blind vendors licensed under the Act be given priority to operate such facilities. 20 U.S.C. § 107(b). In the District of Columbia, vending stands are located on both federal and District government property.

---

1. Plaintiffs originally sought approximately $1,166,000 in damages. Complaint at 16, ¶ 1. Plaintiffs subsequently declined to prosecute

several claims for damages. *See* Praecipe (Dec. 13, 1989).

Once a vendor becomes licensed to operate a facility, the vendor is assigned a vending stand to operate as a sole proprietor. The vendor is given an initial stock of inventory and a petty cash fund. 20 U.S.C. § 107b(2). Thereafter, the vendor is entitled to profits and responsible for losses. The vendor is also responsible for other operating expenses, including the replacement of inventory and the payment of sales tax. Management services, such as the maintenance and repair of vending equipment, are paid for through an administrative levy assessed on the net proceeds of each vendor. 34 C.F.R. § 395.9 (1988). Should the vendor choose to leave the stand or transfer to another, the vendor is required to return the start-up inventory and petty cash.

Another aspect of the program relevant to this lawsuit concerns the collection and distribution of vending machine income. The Act requires that a percentage of vending machine income obtained from machines located on federal or District property be turned over for the benefit of the blind vendors. 20 U.S.C. 107d–3.[2] This requirement was added to the Act in 1954, following congressional dissatisfaction with the limited expansion of the blind vendor program which stemmed in part from the competition presented by automatic vending machines. *See Texas State Comm'n for the Blind v. United States*, 6 Cl.Ct. 730, 732–34 (Ct.Cl.1984) (reviewing legislative history of the Act), *rev'd on other grounds*, 796 F.2d 400 (Fed.Cir.1986). If the vending machine directly competes with a vending facility, the blind licensee who operates that facility is entitled to 100% of the vending machine income. 20 U.S.C. § 107d–3(a). If the vending machine does not directly compete with a vending facility, the vendors are entitled to either 30% or 50% of the income, depending on the nature and use of the property. *Id.* § 107d–3(b). When no licensee is operating a facility on the property, the vending machine income

is deemed "unassigned" and accrues to the blind vendors' pension fund. *Id.* § 107d–3(c). *See also* 34 C.F.R. § 395.32.

At the federal level, the Act delegates to the Secretary of Education ("Secretary") the responsibility for interpreting and enforcing its provisions. In turn, the Secretary is authorized to designate state licensing agencies ("SLA's") to operate the program at the state and local levels. The SLA's are designated following an application and approval process through which they agree to adhere to the requirements of federal law. The SLA's are directly responsible for licensing the blind vendors. 20 U.S.C. §§ 107a(a)(5), 107b; 34 C.F.R. §§ 395.5, 395.7. With respect to obtaining a vending stand, the statutory scheme is two-tiered. A prospective vendor must first apply for a license from an SLA; the SLA in turn applies to a federal agency for placement of the licensee on federal property. *Randolph–Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 93, 102 (D.C.Cir.1986); *see* 20 U.S.C. § 107a(a)(5), (c); 34 C.F.R. §§ 395.7, 395.16, 395.35.

Finally, the Secretary is required to ensure, through appropriate regulations, that licensed vendors receive uniform and adequate training, including on-the-job training. The regulations delegate to the SLA's the responsibility to provide uniform and adequate training of the vendors. *See* 34 C.F.R. § 395.11. The SLA's are further required to provide upward mobility training and follow-up services to ensure that each vendor's "maximum vocational potential is achieved." 20 U.S.C. § 107d–4.

In the District of Columbia, the SLA approved by the Secretary is the District of Columbia Rehabilitation Services Administration ("DCRSA"), a subdivision of the District's Department of Human Services. In this lawsuit, plaintiffs allege that DCRSA has mismanaged the Randolph–Sheppard program in a number of ways.

**2.** The Act defines "vending machine income" to mean receipts after the cost of goods sold (including reasonable service and maintenance costs) where the machines are maintained and serviced by a federal agency; or commissions paid by a commercial vending concern where the machines are maintained and serviced by such a commercial concern. 20 U.S.C. § 107e(8).

Specifically, plaintiffs allege that DCRSA has been remiss in its duty to identify and satisfactorily account for all sources of vending machine income, thus depriving the blind vendors of substantial revenues; that DCRSA and other District agencies have failed to identify satisfactory sites for vending facilities; that DCRSA violated the Act by contracting for management services with a for-profit entity, the DAC Corporation; that the DAC Corporation failed to provide adequate vendor services and wrongfully expended monies with no resulting benefit to the vendors; that DCRSA violated the Act by failing to distribute the surplus from a levy collected from the blind vendors in 1984; that DCRSA violated the Act by failing to reduce the percentage of the levy by three percent between fiscal years 1986 and 1987; that DCRSA violated the Act by failing to enunciate or implement a training and upward mobility program as required by the Act; and that DCRSA violated the Act by excluding the blind vendors from any meaningful participation in major decisions affecting the vending facility program.

## II. FINDINGS OF FACT

*The Parties*

1. Plaintiff the Committee of Blind Vendors (Blind Vendors Committee, or "BVC") is an organization established by the District of Columbia government in Mayor's Order No. 77–131 (Aug. 8, 1977) pursuant to 20 U.S.C. § 107b–1(3). The BVC is comprised entirely of licensed blind vendors and represents the interests of such vendors under the Randolph–Sheppard Act. Plaintiff Randolph–Sheppard Vendors Association of the District of Columbia, Inc. ("Vendors Association"), is a not-for-profit corporation comprised of licensed blind vendors in the District of Columbia.

2. Plaintiff Gale Conard is a blind vendor licensed in the District of Columbia. He operates a vending facility at 601 D Street, N.W., Washington, D.C., is president of the Vendors Association, and is a member of the BVC. Plaintiff Veronica Holt is a blind vendor licensed in the District of Columbia. She operates a vending facility at the Department of Agriculture, 14th Street and Independence Avenue, N.W., Washington, D.C., is coordinator of the BVC, and is a member of the Vendors Association.

3. On September 28, 1988, the Court granted plaintiffs' motion for certification as a class action. *Committee of Blind Vendors*, 695 F.Supp. at 1242–44. The class of plaintiffs herein consists of all blind vendors licensed to operate in the District of Columbia. There are approximately 63 blind vendors in the class. Complaint at 14, ¶ 2.

4. Defendant District of Columbia is a municipality and the locus of the seat of national government. Defendant Marion Barry, Jr., is the Mayor of the District of Columbia and is ultimately responsible for the execution of human service programs within the city, including the execution of the Randolph–Sheppard program.

5. Defendant Peter Parham is Director of the Department of Human Services in the District of Columbia. Defendant Katherine A. Williams is Acting Administrator of DCRSA, a position she has held since March 1, 1987. Williams Tr. 66 (day 3). As Acting Administrator, Ms. Williams is currently responsible for overseeing the operations of the Randolph–Sheppard program in the District of Columbia.

6. Defendant Vernon E. Hawkins is currently Deputy Director of the Department of Human Services in the District of Columbia. He was Administrator of DCRSA from 1981 until February 1985, during the period in which many of plaintiffs' claims arose. Hawkins Tr. 6 (day 3). During the months of December 1984 and January 1985, Donald Brooks filled in for Mr. Hawkins in his capacity as Acting Administrator of DCRSA, as Mr. Hawkins was at that time Acting Commissioner of Social Services. Hawkins Tr. 28–29 (day 3); Brooks Tr. 40–41 (day 4).

7. DCRSA is a subdivision of the Department of Human Services in the District of Columbia. DCRSA has been designated by the Secretary of Education, United

States Department of Education, as the state licensing agency in the District of Columbia. As such, DCRSA is responsible for implementing the provisions of the Randolph–Sheppard Act in the District of Columbia. 34 C.F.R. § 385.5; P–18; Pacinelli Tr. 54 (day 1).

*The Nominee Structure*

8. The Act and its implementing regulations permit the SLA to utilize a "nominee agency" to more efficiently deliver services to blind vendors. The SLA is not required to utilize the services of a nominee, and may instead operate the program on its own. The nominee, if utilized, is to "act as [the SLA's] agent in the provision of services to blind licensees under the State's vending facility program...." 34 C.F.R. § 395.1(1). The nominee is responsible for overseeing the day to day operations of each blind vendor. The nominee is also responsible for providing management services and administrative support, including the payment of salaries to employees of a blind vendor's stand, the collection of vending machine income from designated property, the preparation of personal financial statements for each blind vendor, and the maintenance and repair of vendor equipment. P–125 at 4.

9. The services provided by the nominee are paid for by an administrative levy assessed against the net proceeds of each blind vendor. In 1976, the levy was as high as 38% for some categories of services. Effective July 1, 1984, the levy was reduced to a flat rate of 28%. In 1985 it was reduced to 24%, and in 1986 it was further reduced to 21%. Since 1986, the administrative levy has remained at 21%. P–2; P–116; P–125 at 4; Butka Tr. 143–44 (day 1); Williams Tr. 157–58 (day 4).

10. Under an agreement with the District of Columbia Department of Human Resources, District Enterprises for the Blind, Inc. ("DEB"), a nonprofit corporation, was the nominee organization that provided management services to blind vendors in the District of Columbia from December 1, 1976 to December 31, 1984. George Reed, who worked as a blind vendor for nearly 40 years, was the president of DEB from 1971 until its dissolution in 1985. P–2; D–11; D–20; Reed Tr. 149 (day 1).

11. DEB's operations were financed solely through funds collected from the individual vendors, that is, through the administrative levy. In fiscal year 1984, the levy totalled more than $600,000. P–125 at 5. Neither the District of Columbia government nor the federal government contributed supporting funds to assist DEB's management operations. Butka Tr. 125–26 (day 1).

12. On the whole, the blind vendors were satisfied with DEB's performance and regarded DEB's personnel to be experienced and qualified. Although there were some problems, DEB was generally well-managed and tended to improve as the organization matured. Conard Tr. 12 (day 2); Shanahan Tr. 93 (day 2); Zakarian Tr. 166 (day 1).

13. On January 3, 1983, DCRSA commissioned an independent study of DEB in an effort to improve the blind vendor program in the District. The study was performed by Ensight, Incorporated, a nonprofit management and business assistance firm. D–14. The Ensight study recommended retaining DEB as the nominee, subject to an internal restructuring of DEB's management activities. D–14 at 30; Hawkins Tr. 17 (day 3).

14. On September 12, 1984, DCRSA gave a 90–day notice of termination to DEB. The terms of the contract between the District of Columbia and DEB allowed for such termination without cause. The termination of DEB's contract was initiated by Vernon Hawkins. Herron Tr. 95 (day 3). DEB's termination as nominee became effective December 31, 1984. D–23 (letter from Donald Brooks to George Reed, Sept. 12, 1984).

15. The blind vendors and the BVC strenuously objected to the termination of DEB. They urged DCRSA to restructure DEB rather than contract out for management services. P–23; P–27; Holt Tr. 66 (day 2). Nonetheless, DCRSA unilaterally decided to terminate DEB and "to establish

a new nominee kind of structure." Hawkins Tr. 15 (day 3).

16. DEB was terminated as the nominee notwithstanding its strong financial showing in its final year of operation. Indeed, from January to March 1984, the vending facility program in the District of Columbia experienced one of its best quarters ever. This was attributable to DEB's efforts to cut costs, improve profits, and operate more efficiently. DEB's financial position continued to strengthen through the third quarter of 1984. P–21; P–26; P–29; Butka Tr. 128–30 (day 1).

17. According to official pronouncements, the agreement between the District and DEB was terminated because DCRSA wanted to expand the Randolph–Sheppard program into the operation of large cafeterias, and it was believed that DEB was not capable of managing such large-scale operations. However, the overriding reason that DEB was terminated as the nominee was due to a perception that DEB was functioning beyond the control of DCRSA. Reed Tr. 158–59 (day 1); Conard Tr. 10–11 (day 2); Herron Tr. 96 (day 3).

*The DAC Corporation Contract*

18. On November 16, 1984, the District of Columbia Department of Human Services issued Request for Proposal ("RFP") No. JA/85887, which was a bid solicitation for a "Comprehensive Professional Food Service Management, Consulting and Support Services Program" to be provided to blind licensees operating vending facilities in the District of Columbia under the Randolph–Sheppard program. The RFP was restricted to certified minority businesses only. P–32.

19. In mid-November 1984, sixty-one blind vendors signed a petition opposing the termination of DEB as the nominee and urging DCRSA to accept Ensight's recommendation to retain DEB as the nominee. P–34. This petition was presented to Vernon Hawkins, who was unpersuaded and rejected DEB's pleas. On December 21, 1984, DCRSA awarded the service contract

to the DAC Corporation ("DAC"), a for-profit minority business. The contract took effect January 1, 1985. D–51.

20. DAC replaced DEB in the provision of management services to blind vendors from January 1, 1985 to September 30, 1985. In fact, however, DAC's services were terminated four months earlier, on May 31, 1985. The four month period from June 1 to September 30, 1985 represented the "winding up" of DAC's contractual services to the blind vendors. No services to the blind vendors were provided during this time. P–125 at 4; Conard Aff. (P–175) at 4; Holt Tr. 69 (day 2).

21. Prior to May 31, 1985, DAC provided some accounting services pursuant to its contract. Specifically, DAC provided monthly settlement statements (or profit and loss sheets) to each blind vendor from January through May, 1985. However, these statements were often late and inaccurate, with the result that the vendors were unable to control their finances with accuracy. Holt Aff. (P–176) at 4; Holt Tr. 71–72 (day 2); Conard Tr. 16–17 (day 2); Shanahan Tr. 95 (day 2); Herron Tr. 65–66 (day 5). During this period also DAC collected unassigned vending commissions (those from machines in buildings in which there were no blind vendors), which were placed in the blind vendors' pension fund. Conard Tr. 16–17 (day 2).[3]

22. Viewed overall, DAC provided no appreciable services to the blind vendors during the entire nine months from January 1 to September 30, 1985. Doris Shanahan testified that she received no services while DAC was the contractor. Shanahan Tr. 93–94 (day 2). Lawson Purse testified to the same effect. Purse Tr. 108 (day 2). Gale Conard testified that no DAC employee ever visited his facility, provided management services or technical assistance, or inspected his facility for sanitation and safety. Conard Aff. (P–175) at 3; Conard Tr. 18–19. Veronica Holt also testified that DAC never provided her with assistance or inspected her vending facility

---

**3.** In the original complaint, plaintiffs charged that DAC failed to place unassigned vending machine income into the blind vendors' pension fund account. Complaint ¶ 18. Plaintiffs subsequently declined to prosecute this charge. *See* Trial Brief for Plaintiffs (Dec. 13, 1989).

for sanitation and safety. Holt Aff. (P–176) at 4–5; Holt Tr. 67–68 (day 2).

23. DAC failed to apply for and procure various business licenses for vending facilities. As a result, some vending facilities were operating illegally for a period of time. The blind vendors also did not receive needed repairs in a timely manner. P–93 at 3; Conard Tr. 29 (day 2); Holt Tr. 72, 83 (day 2).

24. Overall, the blind vendors received inadequate services or no services at all while DAC was the contractor. DAC focused its energies on planning the development of large cafeteria operations, or "emporia," rather than on providing services to the individual vendors. Herron Tr. 67 (day 5); Drake Tr. (day 4).

25. DAC had no experience with the Randolph–Sheppard program, no knowledge of the Act or its regulations, no experience dealing with blind persons and their particular needs, and no knowledge of the particular services the blind vendors would require. Conard Tr. 14 (day 2); Shanahan Tr. 94 (day 2); Hawkins Tr. 22–23 (day 3). As a result, DAC employees were sometimes insensitive in their dealings with individual vendors. For example, Andrew Daniel, a snack bar manager in the Archives building, was pulled from his stand for a period of about six weeks. Although defendants insist that he was pulled from his stand due to poor performance, he was given no advance notice or warning before DAC's actions, and he suffered a loss of inventory and financial injury as a result. Daniel Tr. 103–07 (day 2).

26. A review of the expenditures incurred by DEB and DAC reveals that DAC expended far more in funds for its services than did DEB. For the twelve months ending September 30, 1984, DEB spent approximately $303,000 for management services, or approximately $25,000 per month. In contrast, for the nine months ending September 30, 1985, DAC spent approximately $426,000 for its services, or approximately $47,300 per month. Moreover, in view of the fact that the primary services to the vendors were terminated as of May 31, 1985, and that the last four months of

DAC's services were spent "winding up" the contract, a realistic assessment of expenditures reflects that DAC spent approximately $85,000 per month over a five month period, a 250% increase over DEB's monthly average. P–125 at 5–6.

27. In fiscal year 1984, while DEB was nominee, the District appropriated $51,005 to the Randolph–Sheppard program. In fiscal year 1985, while DAC was the contractor, the District appropriated $732,794 to the program. In other words, District appropriated funds were increased by more than 1300% between DEB's tenure and DAC's tenure. P–125 at 5.

28. Although huge sums of money were poured into the Randolph–Sheppard program while DAC was the contractor, the blind vendors did not receive any appreciable benefits as a result. The increased funding from the District to DAC failed to "trickle down" to the vendors. Instead of increasing services to the vendors, DAC spent money for consultants, additional staff, and increased management service expenses. In short, DAC was extremely top heavy in terms of management. P–125 at 5; Troupe Tr. 11–12, 37 (day 2).

29. All funds generated from the Randolph–Sheppard program while DAC was the contractor were funneled into the "Randolph–Sheppard Vending Stand Account—802–627," also known as the "627 account." The 627 account was established by the District of Columbia Department of Human Services to monitor the blind vendor program under DAC's management. The account has a zero balance, which means that all funds deposited therein were expended. D–230; D–233; Atlee Tr. 70–72 (day 4); Herron Tr. 60–61 (day 5).

30. The regulations require that the nominee be a "nonprofit agency or organization." 34 C.F.R. § 395.1; Pacinelli Tr. 61–62 (day 1). Vernon Hawkins testified that DAC was not considered to be a "nominee," and that its for-profit status was therefore irrelevant. Hawkins Tr. 25–28 (day 3); Hawkins Tr. 14–16 (day 5). However, that testimony is unpersuasive, for several reasons. First, as described in both the RFP and the DAC contract, the

services to be provided by DAC encompassed those typically provided by a nominee. Specifically, DAC was required to locate, repair, and replace vending facility equipment as such needs arose; compile and publish monthly financial reports; identify the locations of all vending machine installations and determine commission proceeds; and provide "individual consultation for *Each Operator* within the areas of marketing, merchandising, cash control, review of operating statements, procurement, complaints, sanitation and compliance with program policies and procedures." P–32 (Article III) (emphasis in original); P–51 at 3–4. Second, DCRSA represented to the blind vendors that DAC would take over the functions of a nominee. *See* P–39 (correspondence from Donald Brooks to individual blind vendors, Dec. 14, 1984). Finally, throughout the trial, witnesses for both plaintiffs and defendants referred to DAC as a "nominee" or conceded that DAC performed the functions of a nominee. Herron Tr. 104–05 (day 3); Brooks Tr. 33, 45 (day 4); J. O'Connell Tr. 85 (day 4); B. O'Connell Tr. 132 (day 4).

31. Even before the DAC contract was negotiated, DCRSA administrators were on notice that a service contract with DAC might violate the Randolph–Sheppard Act. On November 30, 1984, Robert Humphreys, counsel for the blind vendors, wrote to Vernon Hawkins and expressed his legal opinion that a contract with DAC for the provision of management services would violate federal law in view of DAC's for-profit status. P–34. Mr. Hawkins took no immediate legal action with respect to this objection. Hawkins Tr. 27–28 (day 3). Blind vendors also directly expressed their concerns that there was no substantive difference between the services provided by DEB and those provided by DAC. P–45 (list of questions submitted to DCRSA in early 1985); Holt Tr. 72–73 (day 2); P–46 at 2 (letter from Veronica Holt to Dr. Pacinelli, Feb. 4, 1985). On March 1, 1985, about a dozen blind vendors walked a picket line in front of DCRSA offices to protest the change in management from DEB to DAC. P–49 (attachment).

32. On March 14, 1985, the federal Rehabilitation Services Administration ("RSA"), a subdivision of the United States Department of Education, informed DCRSA that DAC was functioning as a "nominee" within the meaning of the Randolph–Sheppard Act. Specifically, the RSA found that the range of services DAC contracted to provide "raises the question of whether DAC provides a discrete technical service, or functions as a new nominee organization." The RSA concluded: "The similarity between the DAC contract and a nominee agency agreement causes this Office to believe that DAC functions as a nominee rather than as a contractor providing a management service." P–174 at 1; Pacinelli Tr. 74 (day 1). This conclusion was reached after RSA staff undertook a comparison of the services provided by DEB with those provided by DAC. Pacinelli Tr. 78 (day 1).

33. Following discussions and negotiations with the blind vendors, on March 21, 1985, DCRSA notified the BVC that the contract with DAC would be terminated. P–54. On April 3, 1985, DCRSA informed Carthur Drake, President of DAC, that DAC's contract would be terminated effective May 21, 1985, because it appeared that DAC was "a for profit corporation functioning as a nominee rather than a contractor providing a management service." D–53.

34. DAC's services were paid for in part through District funds and in part through the set-aside levy assessed on the net proceeds of each individual vendor. This levy represents private funds generated by the vendors. Hawkins Tr. 38 (day 4). Because DAC provided no appreciable services to the vendors, the vendors' income was wrongfully diminished in an amount equal to their contribution to the set aside levy during the period of January 1 to September 30, 1985.

*Randolph–Sheppard Nominee, Inc.*

35. After the contract with DAC was terminated, D.C. Randolph–Sheppard Nominee, Inc. ("Nominee") was established to provide management services to the blind

vendors. The Nominee was incorporated on April 28, 1985. Following a transitional period from DAC to the Nominee, the Nominee started its official operations on July 1, 1985. Campbell Tr. 85 (day 4). However, services to the vendors did not emerge until the fall of 1985. Holt Tr. 70 (day 2).

36. During the first two years of the Nominee's existence, the Nominee's provision of direct services to the vendors—including technical assistance, business consulting, inspections, and equipment repair and replacement—was perceived by the vendors to be inadequate. The situation remained chaotic and unstable, and the vendors experienced fear and anxiety in dealing with the new Nominee. Conard Tr. 32–37 (day 2). However, it appears that the vendors were not fully cooperating with the Nominee during its first two years of operation. Some vendors were not paying their bills, creating a cash flow problem for the Nominee and making the program difficult to manage. J. O'Connell Tr. 99–100 (day 4); B. O'Connell Tr. 133–35 (day 4); Williams Tr. 155–56 (day 4). There appeared to be resentment among the vendors stemming from the events that transpired in late 1984, when DCRSA decided to terminate DEB and enter into the contract with DAC.

*The Surplus Levy*

37. A financial audit of DEB completed by Leopold & Linowes for fiscal year 1983–84 revealed a surplus balance of $79,084 in administrative levy. P–63. In the past, surplus amounts in excess of management expenses were customarily returned to the vendors, based on the principle that because the levy is assessed against the vendors' proceeds and represents private earnings, any excess should be refunded. Only once or twice in the past had excess levy funds not been returned to the vendors. This usually occurred when DEB's capital reserves were too low. Reed Tr. 153, 163–64 (day 1).

38. On March 11, 1985, the Board of Directors of DEB wrote to Vernon Hawkins requesting a return of the surplus to the blind vendors. P–50. In a June 14, 1985 letter to Dr. Pacinelli, Vernon Hawkins assured the federal RSA that "whatever amount determined to be 'excess' (approximately $79,000) will be distributed to the vendors after a thorough review of program expenditures has been completed." P–60 at 6. Subsequently, in the fall of 1985, Randolph–Sheppard staff recommended that the surplus levy not be returned to the vendors. P–68 (Memorandum from Thomas Herron to Vernon Hawkins, September 24, 1985).

39. There is some evidence that the decision of whether or not to return surplus levy from the preceding fiscal year is a discretionary one residing in the District government. Zakarian Tr. 168, 182 (day 1); P–1 (Notes to Financial Statements of DEB, June 30, 1975, at 2) (stating that the "excess may be further modified by the District of Columbia Government"). Had DEB remained the nominee through 1985, however, the surplus levy from fiscal year 1984 most likely would have been returned to the vendors. Instead, it appears that this surplus amount was transferred to the District when DEB was terminated, deposited into the 627 account, and subsequently expended by DAC. Zakarian Tr. 173–74 (day 1); Atlee Tr. 64–74 (day 4); D–230.

*Reduction in Administrative Levy*

40. With respect to the amount, or percentage, of set-aside levy to be charged against each vendor's net proceeds, the Act and regulations require that the vendors participate in making this decision. Hawkins Tr. 36–37.

41. When DEB first became the nominee, the administrative levy was set at 33% or 38%, depending on the category of services against which the levy was assessed. P–2; Butka Tr. 143–44. Following discussions between the BVC and administrators of DCRSA, in 1984 the levy was reduced to a flat rate of 28%. Following further discussions, in 1985 the levy was reduced from 28% to 24%. In 1986, the levy was further reduced to 21%, although this time there were no discussions with the BVC. P–36 at 2; Holt Tr. 88–89 (day 2).

42. Correspondence from DCRSA administrators in 1985 indicates a clear intent on the part of the agency to reduce the

levy by another 3% in fiscal year 1987. P–36 at 2 (letter from Donald Brooks to Dr. Pacinelli, Jan. 4, 1985); P–43 at 2 (same); P–60 at 8 (letter from Vernon Hawkins to Dr. Pacinelli, June 14, 1985). In one letter, Vernon Hawkins referred to a "commitment" that DCRSA had made to the blind vendors to reduce the levy by another 3%. P–60 at 8. However, this commitment to reduce the levy was implicitly conditioned on the availability of funds. There was no outright commitment or promise to the vendors that the percentage of the levy would be reduced to 18% without regard to the program's financial condition. Brooks Tr. 35 (day 4).

43. In December 1986, Vernon Hawkins informed the blind vendors that as a result of a shortfall in operating revenues totalling approximately $95,000 for 1986, the previous plans for reducing the levy to 18% could not be carried out. P–116. Moreover, given the financial problems that the Nominee experienced in fiscal year 1988, the administrative levy, which now stands at 21%, cannot be further reduced at this time. There are simply no excess funds available for program development, and a reduction of the levy at this time would diminish services. Williams Tr. 157–58 (day 4).

*Collection of Vending Machine Income*

44. Under the Randolph–Sheppard Act and implementing regulations, vending machine income on Federal and District property accrues to the benefit of the Randolph–Sheppard program. Congress has adopted a three-tiered approach to determine the amount of vending machine income from government property that shall accrue to the blind vendors. Depending upon several factors (such as whether the vending machine is in direct competition with a vending facility operated by a blind vendor, or whether the building is used during other than normal working hours), DCRSA is entitled to receive 100%, 50%, or 30% of all vending machine income on federal property, to accrue to the benefit of blind vendors. 20 U.S.C. § 107d–3; 34 C.F.R. § 395.32(a)-(d).

45. The procedures used in the past for the identification, collection, and accounting of vending machine income on Federal and District property have proven inadequate. No single entity in the District, either local or federal, has taken the lead in identifying and collecting such income for the benefit of the vending facility program. The evidence attests to the difficulty of this task. There are many government buildings in the District, and vending machines are invariably added, relocated, and removed as an agency's changing needs arise. However, the nonexistence of a comprehensive inventory of vending machines and their locations, the lack of coordination between DCRSA and the federal agencies, and the lax monitoring of the collection of vending machine monies have resulted in economic losses to the blind vendors. P–125 at 8–20 (federal property); Castillo Tr. 59 (day 4) (District property).

46. The Randolph–Sheppard program in the District of Columbia has received insufficient vending machine income from certain federal buildings. In some cases, the program has received no income at all. From January 2, 1975, to the date the complaint was filed, no income was received from vending machines located in the House and Senate office buildings. Since 1984, unassigned vending machine income from machines located in the FBI Hoover building of the Department of Justice has been reduced from approximately $55,000 per year to approximately $5,000 per year. Reed Tr. 155–57 (day 1); Herron Tr. 98 (day 3). Vending machine income from machines located in the Bureau of Engraving and Printing has been provided to the program only within the last few years. Herron Tr. 97 (day 3); D–187.

47. The amount of income received from the Hoover building was reduced because the Government Services Administration ("GSA") had awarded a contract to operate the cafeteria in the Hoover building to the Canteen Corporation. This contract encompassed vending machine income and, as a result, the Randolph–Sheppard program receives only a small share of the vending machine income from the Hoover

building. Herron Tr. 97–98 (day 3); Hawkins Tr. 47, 50 (day 5); D–187.

48. In June 1984, DEB recommended to DCRSA that it take legal action to recover the amounts lost from the Hoover building. Reed Tr. 154–57, 161–62 (day 1); P–25. The District protested GSA's award of the contract to the Canteen Corporation. Subsequently, Vernon Hawkins, George Reed, and Lawson Purse (a blind vendor), met with the FBI's legal counsel and were informed that the contract was consistent with the Act. DCRSA therefore declined to take the matter to arbitration. Hawkins Tr. 42, 46–48, 51 (day 5).

49. It is difficult to quantify with reasonable accuracy the losses sustained by the blind vendors as a result of the past mismanagement, oversight, and inadequate use of resources by both federal and District agencies in the identification and collection of vending machine income. P–125 at 8–20; Troupe Tr. 21–22 (day 2).

50. During the latter part of DEB's tenure as nominee, specifically from 1982 to 1984, DEB initiated steps to collect vending machine income from federal property. DEB hired an outside consultant who physically inspected federal buildings to inventory the locations of machines and to demand that vending machine income be turned over to the blind vendors. The inventory was never completed because some federal agencies were not fully cooperating. Zakarian Tr. 176–77 (day 1); D. O'Connell Tr. 138 (day 4). Nonetheless, as the result of DEB's efforts, the amount of vending machine income collected from federal property increased substantially. Butka Tr. 133–34 (day 1). DEB never collected vending machine income from District property because DEB was erroneously informed that the Randolph–Sheppard Act did not apply to District property. *Id.* Tr. 136–37.

51. Under the guidance of Acting Administrator Katherine Williams, DCRSA has recently taken steps toward more accurately identifying vending machine income. DCRSA has requested from GSA a current inventory of all vending machines in federal buildings, but has been informed that GSA does not have the manpower or resources to complete a thorough and updated inventory. DCRSA has therefore obtained bids for the purpose of procuring services that will survey and identify all vending machines on federal property and furnish DCRSA with a comprehensive and updated inventory of vending machines. At the time of trial, DCRSA anticipated that the inventory process would begin in January 1990. Williams Tr. 150–51 (day 4). *Government Vending Management Services, Inc. ("GVMS")*

52. On October 4, 1982, the District of Columbia, through the Department of Administrative Services, contracted with Government Vending Management Services, Inc. ("GVMS") for the provision of uniform vending services with respect to vending machines located on District property. The contract was effective for one year, and was renewed for additional one-year terms through September 30, 1986. GVMS was paid $55,000 annually for its services. P–127; P–31.

53. By the terms of the contract GVMS was required, *inter alia,* to establish and maintain an inventory of all vending machines on District property; to take requests from agencies that either wanted vending machines or wanted them removed; to maintain those machines; to provide a quarterly accounting to the District government of commissions received; and to ensure uniform pricing on the sales of all vending machine products. Castillo Tr. 54–55 (day 4); D–160.

54. To determine how much money would go to the Randolph–Sheppard program under the GVMS contract, the following formula was used. First, GVMS would take 10% of gross commissions on canned sodas and 25% of gross commissions on everything else; this was GVMS's "commission" for collecting the vending machine income, which was taken off the top. DEB would then receive 30% of the remaining balance. Finally, the remainder would go to an "approved agency," that is, one approved by the Director of Administrative Services based on a finding that District employees, tenants, or wards were the pri-

mary users of the vending machine, and that the location of the vending machine could reasonably be identified with a specific organization or fund. Mayor's Order No. 84–160, Sept. 13, 1984 (D–171); Castillo Tr. 47–48 (day 4). Vending machine income from public housing units was exempt from collection under the GVMS contract. D–274; D–319.

55. As a general rule, the Randolph–Sheppard program was entitled to receive 50% of the commissions from vending machines on District property which did not directly compete with a vending facility. However, the program was entitled to receive only 30% of such commissions under certain circumstances, to wit, when at least 50% of the total hours worked on the premises occurred during periods other than normal working hours. *See* 20 U.S.C. § 107d–3(b)(1). Because of the accounting burden involved in determining whether the program was entitled to receive 50% or 30% of the income from any given building, DCRSA worked out an agreement with the Department of General Services to receive 30% of the net receipts of the vending machine income collected, as reflected in the formula recited above. Herron Tr. 69–70 (day 5).

56. A financial and program compliance audit prepared in 1987 found that for the period October 4, 1982 through September 30, 1986, GVMS collected gross commissions from vending machines on District property totalling nearly $510,000. Of that amount, GVMS received nearly $200,000 in management fees, while the Randolph–Sheppard program received approximately $66,000. P–127 at 17–21; Washington Tr. 48–50 (day 2).

57. Otis Troupe, District of Columbia Auditor, concluded in 1987 that elimination of the GVMS contract would result in savings for the District of an estimated $55,-000 annually, because the city would no longer be required to pay GVMS the contract price for its services. P–125 at 13. But that estimated saving fails to take into account the contract's replacement cost— that is, how much it would cost the District to bring the contract in house—including,

but not limited to, the cost of finding another entity to conduct inventories and on-site physical inspections of vending machines. Troupe Tr. 44–48 (day 2); Johnson Tr. 66–74 (day 2). Indeed, District officials concluded that the GVMS contract could not be brought in house for lack of resources and manpower, and it was estimated that a minimum of ten people would be required to do the work that GVMS had contracted to do. Washington Tr. 57 (day 2); Campbell Tr. 76–80 (day 4).

*Vendor Training*

58. Under the Randolph–Sheppard Act, DCRSA is required to provide on-the-job training and upward mobility training for licensed blind vendors. 20 U.S.C. § 107d–4; 34 C.F.R. §§ 395.3(a)(7), 395.11. The regulations further state that "effective programs of vocational and other training services, including personal and vocational adjustment, books, tools, and other training materials, shall be provided to blind individuals" by the state licensing agency. 34 C.F.R. § 395.11.

59. Training was inadequate while DAC was under contract to provide services. Conard Aff. (P–175) at 4–5. Training was also inadequate for a period of time following DAC's termination. From December 1985 to September 1986, there was no training coordinator, despite increased financial resources. This void hampered the entry into the program of seven or eight vendors. P–125 at 7; P–130; Troupe Tr. 33–34 (day 2); Johnson Tr. 58–59 (day 2).

60. The Randolph–Sheppard program in the District currently has one training coordinator, Margaret Davis, who was hired July 31, 1989. Ms. Davis is qualified for the position in light of her academic qualifications and career experience, which includes 24 years of experience in the District's Department of Social Service. She is a licensed social worker and has given lectures to the blind. Before her arrival as training coordinator there was a vacancy in the position for a period of about one year. DCRSA had attempted to fill the position much earlier, in February 1988, but there were no applicants. Williams Tr. 69–72 (day 3); Davis Tr. 7, 12–15, 27 (day 4).

61. The training program for vendors and potential vendors is currently a three-step process. First, trainees receive classroom training at the University of the District of Columbia, taking courses such as business, business mathematics, personnel management, accounting, and retail management. Trainees are also required to take a certification course in sanitation. The training coordinator attends the classes with the trainees and tracks their progress. Davis Tr. 10–11 (day 4); D–196. Second, trainees receive on-the-job training for four to six weeks at Training Facility Number 50, located in the Department of Corrections. Third, trainees enter a mentorship program in which they work with a variety of preapproved vendors to obtain a diverse working experience. Davis Tr. 7–8 (day 4); D–193.

62. Until recently, the training provided to the vendors has been on a very basic level. The books and other training materials have generally been unsophisticated. There has been a lack of detailed training or guidance as to business techniques designed to ensure overall profitability. P–125 at 7–8; Johnson Tr. 58 (day 2); Davis Tr. 27 (day 4).

63. The training program currently used is still in the proposal stage. The program was initially designed by Margaret Davis without the participation of the blind vendors. Davis Tr. 26 (day 4). DCRSA has since submitted the proposed program to the BVC for its comments and revisions. Williams Tr. 152–53 (day 4); D–193.

*Vendor Participation*

64. Administration of the Randolph–Sheppard program by the SLA requires active participation by the BVC "in major administrative decisions and policy and program development." 20 U.S.C. § 107b(3)(A); 35 C.F.R. § 395.14(b)(1)–(5). The requirement of active participation contemplates an open, honest dialogue between the state agency and the BVC, the exchange of written materials, oral briefings, and open meetings. Pacinelli Tr. 55–58 (day 1); P–18.

65. Active solicitation of the views of the blind vendors is required with respect to the development and implementation of the training program. 20 U.S.C. § 107b–1(3). Active vendor participation is also required when setting out the method of determining the amount of the set-aside levy to be assessed against the net proceeds of the vendors. 34 C.F.R. § 395.9(c); Pacinelli Tr. 57–58 (day 1); Holt Tr. 74 (day 2); P–18.

66. Until recently, DCRSA has generally failed to respond to the requests, recommendations, communications, or demands made by the blind vendors or the BVC. Butka Tr. 129–30 (day 1); Reed Tr. 157 (day 1). The blind vendors have often felt that they were not allowed any meaningful participation in the making of major decisions. These concerns have been frequently expressed to DCRSA and to the Regional Office. *E.g.,* P–27 (memorandum from BVC to Vernon Hawkins, July 17, 1984); P–45 (list of questions submitted by blind vendors to DCRSA in early 1985); P–46 (letter from Veronica Holt to Dr. Pacinelli, Feb. 4, 1985); P–58 (letter from Robert Humphreys to Dr. Pacinelli, May 21, 1985); Shanahan Tr. 97–98 (day 2). Repeatedly, major administrative or policy decisions have been made without the participation of the BVC. Holt Tr. 73–74, 79, 83–84 (day 2); Shanahan Tr. 99–100 (day 2); Purse Tr. 109–10 (day 2).

67. Defendants' consistent failure in the past to allow for the meaningful participation by the BVC in major program and policy decisions was a proximate cause of many elements of plaintiffs' claims.

68. Since Katherine Williams has taken over as Acting Administrator of DCRSA, the BVC has been asked to participate in major administrative and policy decisions to a much greater extent. Holt Tr. 81–82 (day 2); Williams Tr. 75–76, 83–86 (day 3); Williams Tr. 153–54, 159–65 (day 4).

## III. CONCLUSIONS OF LAW

1. This action arises under the Randolph–Sheppard Vending Stand Act, as amended, 20 U.S.C. §§ 107–107f ("the Act"). This Court has jurisdiction over the

action under Article III, § 2 of the United States Constitution, and 28 U.S.C. § 1331.

2. The Act was created to benefit the blind. Specifically, Congress accorded licensed blind vendors priority to operate vending facilities on federal and District government property "[f]or the purpose of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind in greater efforts in striving to make themselves self-supporting." Pub.L. No. 74–732, § 1, 49 Stat. 1559 (1936) (codified as amended at 20 U.S.C. § 107 (1982)); *see also* S.Rep. No. 937, 93d Cong., 2d Sess. 3 (1974) (stating that the Act was amended to remove certain obstacles to the growth of the blind vendor program and to further protect the "livelihood, rights, and economic interests of blind vendors"). This Court's conclusions with respect to plaintiffs' rights and defendants' obligations under the Act must be consistent with and in furtherance of this clearly stated congressional policy.

3. The Randolph–Sheppard Act requires that SLA's "provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending facility program an opportunity for a fair hearing." 20 U.S.C. § 107b(6). Under this authority, a dissatisfied vendor has the right to submit to the SLA a request for a "full evidentiary hearing." *Id.* § 107d–1(a). Grievances not resolved at the hearing are to be submitted to an arbitration panel convened by the Secretary of Education. *Id.* The arbitration decision is subject to appeal and review as a "final agency action." *Id.* § 107d–2(a). The Court of Appeals for this Circuit has held that vendors dissatisfied with the "operation or administration" of the Randolph–Sheppard Act must, as a general rule, exhaust their administrative remedies before being heard in federal court. *Randolph–Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 103–04 (D.C.Cir.1986). Other jurisdictions have similarly concluded that resort to arbitration under the Act is mandatory. *E.g., Fillinger v. Cleveland Soc'y for the Blind*, 587 F.2d 336, 338 (6th Cir.1978); *New York v. United States*

*Postal Service*, 690 F.Supp. 1346, 1348–51 (S.D.N.Y.1988); *Massachusetts Elected Committee of Blind Vendors v. Matava*, 482 F.Supp. 1186, 1189 (D.Mass.1980).

■ 4. In its October 7, 1988 opinion, this Court held that plaintiffs were not required to exhaust their administrative remedies before seeking relief in this Court. Specifically, the Court found this to be a "compelling case for invoking the futility exception to the exhaustion doctrine because resort to administrative remedies would be useless." *Committee of Blind Vendors*, 695 F.Supp. at 1240. The Court today reaffirms that conclusion. Plaintiffs herein were effectively deprived of an administrative tribunal through no fault of their own. The BVC originally requested a hearing from DCRSA on October 23, 1985, making some of the same allegations contained in this complaint. In January 1986, DCRSA requested that the D.C.Office of Fair Hearings conduct an evidentiary hearing. After the completion of certain audits during the months that followed, a hearing was scheduled for September 2, 1987. On August 28, 1987, the BVC requested an indefinite continuance of the hearing in light of an opinion from the D.C.Superior Court holding that an evidentiary hearing on a Randolph–Sheppard complaint would have no legal effect because the District of Columbia had failed to promulgate fair hearing procedures as required by law. *See Schlank v. Williams*, No. 1164–85 (July 16, 1987) (Wagner, J.). Moreover, on January 19, 1988, the Department of Education clarified that it had "no choice" but to decline to entertain arbitration requests from District of Columbia vendors in light of the absence of procedures to govern fair hearings. *Committee of Blind Vendors*, 695 F.Supp. at 1240. On January 21, 1988, plaintiffs filed this suit. In sum, the procedural history of this case reflects precisely those "unusual circumstances" and "equitable reason[s]" which exempt a complaint from the exhaustion requirement. *Randolph–Sheppard Vendors*, 795 F.2d at 102 n. 18.

5. Defendants inform the Court that final regulations for evidentiary hearings

have since been promulgated and are now in effect. They suggest that the Court remand this case to DCRSA for resolution by administrative process. The Court declines this belated invitation. Undoubtedly, resolution of the claims presented in this case would have been simplified by the benefit of administrative expertise. In addition, complex cases such as this one tax the resources of the Court. But those reasons do not authorize the Court to decline jurisdiction where it properly exists. Plaintiffs are entitled to a resolution of their grievances, which have been pending in some form since 1985. The Third Circuit's conclusion sheds light on the issue: "The evolution of the Randolph–Sheppard Act from 1936 through 1974 shows increasing concern that the contractual remedies available to [the] vendors be expeditious and completely effective." *Delaware Dep't of Health and Social Servs.*, 772 F.2d at 1139. This Court will not require plaintiffs to further delay resolution of their claims to give effect to recently adopted rules that should have been promulgated some fifteen years ago. *See Committee of Blind Vendors*, 695 F.Supp. at 1239 n. 3.

■ 6. In its October 7, 1988 opinion, this Court agreed with the analysis in *Delaware Dep't of Health and Social Servs.*, *supra*, in which the Third Circuit concluded that blind vendors were, in effect, third party beneficiaries of the licensing agreements between the participating states and the federal government. *See* 772 F.2d at 1127; *Committee of Blind Vendors*, 695 F.Supp. at 1240–41. The Court today reaffirms its concurrence with that analysis. The Act was intended to benefit blind vendors and confer upon them legally enforceable rights. Plaintiffs' claims in this action are grounded in their contractual relationship with the defendants or their status as beneficiaries of contracts between defendants and the United States. Accordingly, monetary damages are available to aggrieved plaintiffs under the Randolph–Sheppard Act.

7. Defendants request that the Court depart from its earlier opinion and the analysis set forth in *Delaware Dep't of*

*Health* and instead follow a more recent Eighth Circuit case in which a divided court held that retroactive money damages are not available to blind vendors under the Randolph–Sheppard Act. In *McNabb v. United States Dep't of Educ.*, 862 F.2d 681, 683 (8th Cir.1988), *cert. denied*, — U.S. ——, 110 S.Ct. 55, 107 L.Ed.2d 23 (1989), two Judges concluded that the eleventh amendment forbids subjecting states to monetary liability for their participation in the Randolph–Sheppard program, because no clear and unambiguous congressional intent to impose such liability is expressed in the Act. *Id.* at 685–87 (Fagg & Doty, JJ., dissenting and concurring). This Court declines to follow the divided opinion in *McNabb*. The Court adheres to its earlier opinion, the exhaustive analysis of the Third Circuit in *Delaware Dep't of Health*, and Chief Judge Lay's dissenting view in *McNabb*, in which he concluded that Congress, in enacting the Randolph–Sheppard Act, "clearly must have foreseen and approved awards of compensatory relief against states." *McNabb*, 862 F.2d at 684 (Lay, C.J., concurring and dissenting).

8. Defendants argue that plaintiffs may not challenge defendants' allocation of resources under the Randolph–Sheppard Act. In the final analysis, the Court's monetary award to these plaintiffs is not assessed against District of Columbia appropriated funds. Rather, the source of funds upon which the District's liability rests is the vendors themselves. The award sounds in restitution. Accordingly, the Court is not, as defendants fear, dictating to the agency "how best to allocate its resources." *Wisconsin v. Federal Power Comm'n*, 373 U.S. 294, 313–14, 83 S.Ct. 1266, 1276–77, 10 L.Ed.2d 357 (1963).

9. On November 22, 1988, the Court held that the three-year statute of limitations found in D.C.Code § 12–301 applies to plaintiffs' claims. Memorandum (Nov. 22, 1988) at 7. Thus, events occurring prior to January 21, 1985, are generally not actionable. However, the Court further held that the "continuing wrong" doctrine applied in this case, subject to plaintiffs' proof. Under this doctrine, the statute of limitations may be "tolled" so that plain-

tiffs' claims do not accrue until defendants cease their unlawful conduct. *Id.* at 12. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81, 102 S.Ct. 1114, 1125–26, 71 L.Ed.2d 214 (1982). Whether defendants' conduct constituted a continuing wrong will be addressed with respect to each claim.

*The DAC Corporation Contract*

■ 10. The Randolph–Sheppard regulations define "nominee" to mean "a nonprofit agency or organization designated by the State licensing agency through a written agreement to act as its agent in the provision of services to blind licensees under the State's vending facility program." 34 C.F.R. § 395.1(1). The evidence clearly established that in functional terms, DAC Corporation was a nominee within the meaning of these regulations. In contracting with DAC, a for-profit entity, to provide management services to the blind vendors, the District of Columbia violated the Randolph–Sheppard Act.

■ 11. The Act requires participation by the BVC in "major administrative decisions and policy and program development" of the Randolph–Sheppard program. 20 U.S.C. § 107b–1(3). Likewise, the regulations state that the BVC shall "[a]ctively participate with the State licensing agency in major administrative decisions and policy and program development decisions affecting the overall administration of the State's vending facility program." 34 C.F.R. § 395.14(b)(1). The evidence established that DCRSA's decision to terminate DEB and to utilize DAC instead was motivated in part by DCRSA's desire to expand the District's vending facility program into the operation of large "emporia." This was a major administrative decision regarding program development which by law required the active participation of the BVC. Likewise, DCRSA's decision to utilize DAC to carry out this program expansion required the active participation of the vendors.

12. The evidence established that DCRSA acted unilaterally when it issued the RFP to minority businesses, when it terminated DEB, and when it entered into

the contract with DAC. In fact, DCRSA not only failed to involve the BVC in these major decisions, but it actively ignored the BVC's vocal protests and legitimate concerns regarding DAC's for-profit status and inexperience with the vending facility program. The failure by DCRSA administrators to allow for the active participation of the BVC when deciding to enter into the management service contract with DAC violated the Randolph–Sheppard Act.

■ 13. Defendants maintain that issues involving the District's contract with DAC are not actionable because the contract was entered into on December 21, 1984, and performance began on January 2, 1985, while the complaint was filed January 21, 1988, more than three years later. This Court has already noted that discrete conduct, such as entering into a contract, generally cannot be classified as a continuing wrong. Memorandum (Nov. 22, 1988) at 12. In two distinct respects, however, the District's contract with DAC constituted a "continuing wrong" with respect to plaintiffs.

First, the contract was solicited without the participation of the BVC, in violation of the Act. Moreover, DCRSA continued to ignore the vendors' protests. DCRSA's chronic failure to involve the BVC in any major decisions regarding DAC's services continued through the first few months of 1985, well within the three-year statutory period. *See, e.g.,* P–46 (letter from Veronica Holt to Dr. Pacinelli, Feb. 4, 1985); P–49 (letter from Robert Humphreys to Dr. Pacinelli, Mar. 7, 1985). Since plaintiffs have challenged DCRSA's "continuing pattern, practice, and policy" of unlawfully refusing to allow the BVC to actively participate in major administrative and program decisions, plaintiffs' complaints with respect to the DAC contract are timely. *Havens Realty,* 455 U.S. at 381, 102 S.Ct. at 1125.

Second, the DAC contract was financed in part with funds levied from the vendors' net proceeds as authorized by 34 C.F.R. § 395.9. These funds were extracted from the vendors despite the fact that DAC was an illegal nominee that provided no appreciable services. Said another way, these lev-

ied funds were wrongfully taken from the vendors, and this wrongful taking continued into mid–1985. The Court concludes that this taking was a continuing wrong for which the statute of limitations did not begin to run until defendants stopped collecting the levy to fund the illegal contract, that is, upon DAC's termination on May 31, 1985. *See Almond v. Boyles*, 612 F.Supp. 223, 228–29 (E.D.N.C.1985) (holding that state's wrongful deduction from blind vendors was "a continuing wrong for which the statute of limitations did not begin to run until the defendants stopped making the deductions"), *aff'd in part and rev'd on other grounds*, 792 F.2d 451 (4th Cir. 1986), *cert. denied*, 479 U.S. 1091, 107 S.Ct. 1302, 94 L.Ed.2d 157 (1987). Since defendants' conduct constituted a continuing wrong, plaintiffs' claims regarding the DAC contract are not time-barred, and plaintiffs' recovery, set forth below, is not limited to amounts collected after January 21, 1985.

■ 14. During fiscal year 1985, the Randolph–Sheppard program in the District collected $525,423.00 in the form of an administrative levy assessed against the net proceeds of the individual vendors.[4] This levy, or set aside fund, represents private funds generated by the vendors and was intended to defray the costs of management services provided to the vendors during fiscal year 1985 pursuant to DCRSA's licensing agreement with the federal government. *See* 34 C.F.R. § 395.9(b). The evidence established that the vendors received no appreciable services from January 1 to May 31, 1985, while DAC's contract was in effect, and received no services at all from June 1 to September 30, 1985, while DAC was winding up its operations. Services to the vendors did not resume until the fall of 1985. Since the vendors were deprived of management services for this nine month period, they are entitled to restitution of the amount they paid for services that should have been rendered. An appropriate award is arrived at by returning to plaintiffs ¾ of the levy assessed against their net proceeds in fiscal year 1985, in compensation for the 9/12 of the year they were without services. The Court will therefore award plaintiffs $394,-067.25, which represents 75% of the levy assessed in fiscal year 1985, to compensate the blind vendors for the amount their income was wrongfully diminished during the nine months in which DAC was the contractor.[5]

■ 15. In the District of Columbia, the general rule is that interest may be recovered only from the date of judgment. *See* D.C.Code Ann. § 15–109 (1989). However, prejudgment interest may be awarded where "necessary to fully compensate the plaintiff[s]." *Id.; Edmund J. Flynn Co. LaVay*, 431 A.2d 543, 550 n. 6 (1981). The Court finds that plaintiffs in this case are entitled to prejudgment interest. By virtue of the District's failure to promulgate timely evidentiary hearing regulations, the blind vendors were deprived of an administrative forum and made to tolerate lengthy delays in resolving this dispute. *Cf. Granite–Groves v. Washington Metro. Area Transit Auth.*, 845 F.2d 330, 342–43 (D.C. Cir.1988) (award of prejudgment interest under § 15–109 justified where processing of plaintiff's claims by contracting officer was subject to unreasonable delay). Plaintiffs' claims arise from contract, not tort, therefore prejudgment interest is allowed. *See Reiman & Co. v. Eromanga Invs., N.V.*, 622 F.Supp. 13, 21 & n. 33 (D.D.C. 1985); *compare Schneider v. Lockheed Aircraft Corp.*, 658 F.2d 835, 855 (D.C.Cir. 1981) (prejudgment interest not allowed in tort actions), *cert. denied*, 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982).

16. The Court further concludes that interest on this claim should be calculated from January, 1985, when the DAC contract first took effect, to the date of this decision. The rate of interest for contract

---

**4.** This figure is taken from Form RSA–15 for the period of October 1, 1984 to September 30, 1985. P–81 at 2 ("Accountability of Set-Aside Funds Collected under the Vending Facility Program from All Sources").

**5.** $525,423 × 75% = $394,067.25.

actions is set by statute. In the District of Columbia, that rate is 6% per annum. D.C. Code Ann. § 28–3302(a) (1981 & Supp. 1989). Accordingly, the Court will award plaintiffs $394,067.25, as noted above, plus interest in the amount of $126,022.71, for a total recovery of $520,089.96 in compensation for the amount the vendors' income was wrongfully diminished while DAC was the contractor.[6] This amount shall be distributed to the blind vendors pro rata in amounts equal to, or in proportion to, each vendor's contribution to the set aside fund during the period of January 1 to September 30, 1985.

*The Surplus Levy*

17. A financial audit of DEB for fiscal year 1984 revealed a surplus in the administrative levy of $79,084. This figure represents an excess in the amount the vendors paid for management services over the amount actually expended by DEB on their behalf. On September 30, 1984, this amount was identified as available for distribution to the vendors, as was customary. The evidence established that in March 1985 the Board of Directors of DEB demanded that the surplus be returned. DCRSA thereafter acknowledged its obligation to refund the excess amount, "after a thorough review of program expenditures has been completed." P–60 at 6. DCRSA never refunded this surplus.

18. A review of program expenditures reveals that this excess amount was transferred to the 627 account[7] and was accordingly used to pay for management services that DAC contracted to provide. The Court has already concluded that the DAC contract was illegal under the Act and that DAC's failure to provide any appreciable services to the vendors entitles them to a partial refund of the levy assessed in fiscal year 1985. For those same reasons, DAC's expenditure of the excess was wrongful. The vendors are therefore entitled to a refund of the surplus identified as available on September 30, 1984.

19. Defendants assert that plaintiffs' claim to this surplus is time barred. They argue that plaintiffs' claim arose on September 30, 1984, when the surplus was first identified in the audit as available for distribution. This argument is unpersuasive. In view of the letter from Vernon Hawkins to Dr. Pacinelli acknowledging DCRSA's obligation to refund the excess, *see* P–60, plaintiffs clearly had no reason to believe that a refund would not be forthcoming until Randolph–Sheppard staff so decided a year later, in September, 1985. *See* P–68. Defendants put forth no evidence to show that DCRSA normally would have distributed the surplus on the date it was identified. Moreover, the regulations contemplate that the decision about whether surplus levy is to be refunded is normally a joint one involving both DCRSA and the "active participation" of the BVC. 34 C.F.R. § 395.9(c). Defendants' decision not to refund the surplus was clearly a unilateral one. Under these circumstances, the Court concludes that plaintiffs' legal claim to the surplus did not accrue until it was disputed sometime during the fall of 1985, well within the three-year statutory limit. Accordingly, plaintiffs' claim is not barred by the statute of limitations.[8]

20. Finally, the Court concludes that the vendors are entitled to an award of prejudgment interest on this claim, and that interest should accrue from September 1985 (when defendants unilaterally decided not to refund the surplus) to the date of this decision. Accordingly, the Court will award plaintiffs $79,084, plus interest in

---

6. $394,067.25 × 6% × 5.33 years = $126,022.71.

7. The 627 account refers to the "Randolph–Sheppard Vending Stand Account—802–627," which was established by the District to monitor the blind vendor program under DAC's management. D–233; *see supra* Fact 29.

8. Admittedly, the Court has some difficulty accepting defendants' arguments that plaintiffs' claims are time-barred. Plaintiffs timely requested an evidentiary hearing in October 1985, which ultimately they did not receive through no fault of their own. The statute of limitations was designed to avoid the litigation of "stale" claims. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214 (1982). It would be unfair to label plaintiffs' claims "stale" when they should have been litigated in an administrative forum more than two years ago, as plaintiffs originally intended.

the amount of $21,352.68,[9] for a total recovery of $100,436.68 with respect to this claim. This amount shall be distributed to the vendors pro rata in amounts equal to, or in proportion to, each vendor's contribution to the set aside fund during fiscal year 1984.

*Reduction of Administrative Levy*

█ 21. Plaintiffs claim that DCRSA promised to reduce the administrative levy from 21% to 18% beginning in fiscal year 1987. They claim that DCRSA breached this promise and ask for damages in the amount of $112,000, which represents the amount the vendors would have saved had the levy been reduced by 3% in fiscal years 1987 and 1988. The evidence showed that no outright promise was made, but rather that DCRSA's commitment to reduce the levy was conditioned on the availability of funds. The evidence further showed that the levy, which now stands at 21%, cannot be further reduced without diminishing services to the vendors. Accordingly, the Court concludes that defendants breached no promise to plaintiffs respecting this claim, because the condition precedent to a 3% reduction was not satisfied. Plaintiffs' request for damages with respect to this claim is therefore denied.

*Collection of Vending Machine Income*

22. Plaintiffs claim that defendants have failed to identify, collect, and distribute to the blind vendors all vending machine income from machines located in federal buildings, in violation of 20 U.S.C. §§ 107b(1), 107d–1(b), 107d–3(a), (b), (c), and 34 C.F.R. §§ 395.8, 395.9, 395.32, 395.-37. The evidence clearly supports plaintiffs' assertion that not all vending machine income from federal sources has been identified and accounted for. But as plaintiffs concede, it is very difficult, perhaps impossible, to trace these amounts with any reasonable accuracy.

23. It is undisputed that DCRSA is obligated to distribute to the blind vendors income which has been disbursed to DCRSA by the federal agencies. *See* 34

C.F.R. § 395.8(a). However, defendants argue that Congress placed the legal responsibility for the collection of, and accounting for, vending machine income from federal property on the managers of that federal property, and not on the SLA's. Specifically, in the same section of the Act in which Congress provided that vending machine income on federal property would accrue to the blind vendors, Congress also stated:

> The head of each department, agency, and instrumentality of the United States shall insure compliance with this section with respect to buildings, installations, and facilities under his control, and shall be responsible for collection of, and accounting for, such vending machine income.

20 U.S.C. § 107d–3(b)(2); *see also* S.Rep. No. 93–937, 93d Cong., 2d Sess 21 (1974) ("Agency heads are responsible for collection of, and accounting for, all vending machine income."). The regulations further support this interpretation of the Act. The regulations state, in relevant part:

> The on-site official responsible for the Federal property of each property managing department, agency, or instrumentality of the United States, in accordance with established procedures of such department, shall be responsible for the collection of, and accounting for, vending machine income from vending machines on Federal property under his control and shall otherwise ensure compliance with the provisions of this section.

34 C.F.R. § 395.32(a). When these regulations were promulgated, the Secretary had concluded that the collection of and accounting for income by the federal agencies, for distribution to the blind vendors through the SLA's, would provide "the most effective means for ensuring that vending machine income funds are both properly collected and accounted for." 42 Fed.Reg. 15802, 15805 (Mar. 23, 1977).

24. The Court is unaware of any judicial opinions clarifying the respective duties of the federal and state agencies under 20

---

**9.** $79,084 × 6% × 4.5 years = $21,352.68.

U.S.C. § 107d–3. The cases arising under this section of the Act have involved other issues not raised in this case. For example, the Ninth Circuit has considered whether § 107d–3, by requiring newspaper publishers to turn over to blind vendors all of their income from newsracks on federal property, is consistent with the first amendment. *See Jacobsen v. United States Postal Service*, 812 F.2d 1151 (9th Cir.1987) (reversing the district court's denial of preliminary injunctive relief on behalf of the publishers and remanding for further factual findings). And several courts have construed the scope of § 107d–3(d), which exempts from the vending facility program income from vending machines located on military exchanges. *See Texas State Comm'n for the Blind v. United States*, 796 F.2d 400 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987); *Oklahoma ex rel. Department of Human Servs. v. Weinberger*, 582 F.Supp. 293 (W.D.Okla.1982), *aff'd*, 741 F.2d 290 (10th Cir.1983).

25. No on-site federal officials or federal property managers are defendants in this case. Defendants are the District of Columbia and administrators of DCRSA, a District of Columbia agency. Defendants argue that they are not legally obligated to collect and account for vending machine income from machines located on federal property, because by statute that task belongs solely to the federal government. The Court does not entirely accept that position, for two reasons.

First, there is evidence that GSA has, in the past, delegated to the SLA or the nominee some of the responsibility for identifying and collecting vending machine income on federal property. *E.g.*, Marcus Tr. 110–12 (day 1). This *de facto* delegation is borne out by the fact that from 1982 to 1984, while DEB was nominee, DEB took upon itself the responsibility for identifying and collecting such income. *See* Butka Tr. 133–34 (day 1).

Second, in accordance with the statutory scheme, the Secretary of Education—a federal official—has designated DCRSA as the agency responsible for implementing the Randolph–Sheppard program in the District of Columbia. That designation was made pursuant to the Secretary's finding that DCRSA would administer the program so as to "stimulate and enlarge the economic opportunities for the blind...." 34 C.F.R. § 395.5. DCRSA is further required to "[c]ooperate with the Secretary in applying the requirements of the Act in a uniform manner...." *Id.* § 395.3(a)(11)(i). It therefore defies the statutory scheme to conclude that DCRSA has no responsibility whatsoever for insuring that the District's vending facilities program is receiving all the income to which it is due. The Randolph–Sheppard program can operate successfully only through the joint efforts of federal and state agencies.

26. For the purposes of this lawsuit, it is not necessary for the Court to precisely demarcate the respective roles of the federal and state agencies in carrying out their statutory obligations to identify, collect, account for, and distribute to the blind vendors vending machine income obtained from federal property. As plaintiffs concede, it is difficult to quantify the losses sustained by the vendors as a result of the past mismanagement, oversight, lax monitoring, and lack of cooperation between the federal and state agencies with respect to this task. Because an award of damages would be merely speculative, the Court denies such relief.

27. With respect to injunctive relief, the evidence shows that since this lawsuit was filed, DCRSA has undertaken steps to compile a complete and accurate inventory of vending machines in federal and District buildings. Those steps are most encouraging. The success of DEB's persistent efforts to identify the locations of vending machines from 1982 to 1984, with the resulting increase in income to the vendors, reflects that cooperative endeavors between DCRSA (and its nominee) and the federal property managers are the most effective means by which to carry out the mandates of the Act. In any case, it is unnecessary for the Court to order DCRSA to complete an inventory of federal buildings, as plaintiffs originally requested, be-

cause DCRSA is already undertaking that task. For these reasons, plaintiffs' request for monetary and injunctive relief with respect to this claim is denied.

28. Plaintiffs also argue that the Act was violated when—after the FBI Hoover building entered into a contract with the Canteen Corporation and reduced the income received from vending machines located therein—defendants failed to file a complaint for arbitration with the Secretary of Education to contest the unilateral reduction of income. The evidence showed that DCRSA declined to take the matter to arbitration because it concluded, after conferring with federal officials, that the FBI's actions did not violate the Act.

The Randolph–Sheppard Act does not specifically require that the SLA file a complaint on the vendors' behalf for any specified grievances. Rather, the Act's language is permissive:

> Whenever any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this Act or any regulations issued thereunder ... such licensing agency *may file a complaint with the Secretary* who shall convene a panel to arbitrate the dispute....

20 U.S.C. § 107d–1(b) (emphasis added); *see also* 34 C.F.R. § 395.37. It is arguable that the SLA's decision about whether or not to file a complaint with the Secretary is committed to the SLA's discretion. *Cf. Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (agency's refusal to pursue enforcement action deemed committed to agency discretion by law and presumptively unreviewable).

29. In *Georgia Dep't of Human Resources v. Bell,* 528 F.Supp. 17 (N.D.Ga. 1981), the court concluded that the SLA's decision about whether or not to file a complaint with the Secretary is not wholly discretionary. Specifically, the court concluded that the Act imposes upon the SLA the obligation "to pursue a licensed blind vendor's grievance when his rights are ar-

guably being jeopardized by the Federal agency's actions." *Id.* at 24. To hold otherwise would lead to the anomalous result that the blind vendors would have no recourse against federal agencies. *See id.* This Court finds that analysis sound and in accordance with the policies guiding the Act.

30. For the purposes of resolving this lawsuit, however, it is unnecessary for the Court to decide upon the preferable rule of law. There was insufficient evidence to support a finding that defendants violated the Act by failing to take this matter to arbitration. The evidence as to the legality of the Canteen Corporation contract is inconclusive. Of course, the Court is bothered by the very sizable reduction in income suffered by the vendors with respect to this property. But the reasons underlying the conclusion of the FBI's legal counsel that the FBI's actions comported with the Act, which reasons were revealed to DCRSA and several blind vendors, are not evident from this record. Therefore, the Court is in no position to hold that defendants violated the Act by failing to take the matter to arbitration. For this reason, plaintiffs' request for relief with respect to this claim is denied.

*The GVMS Contract*

31. The GVMS contract was entered into for the purpose of providing uniform vending services with respect to vending machines located on District property. The Act authorizes the District to use a contractor, or "commercial vending concern," to provide management services with respect to these machines. *See* 20 U.S.C. § 107e(8); 34 C.F.R. § 395.1(z). Thus, the District's decision to enter into a contract with GVMS was in accordance with the Act.

32. As the Court already concluded, plaintiffs' contention that the District's elimination of the GVMS contract would have resulted in the District saving an estimated $55,000 annually is not supported by the evidence. Plaintiffs' claim that GVMS was an unnecessary intermediary fails to take into account the many factors relevant to the contract's replacement cost. *See*

*supra* Fact 57. Accordingly, plaintiffs' request for relief with respect to this claim is denied.

■ 33. The heart of plaintiffs' complaint with respect to the GVMS contract is that GVMS failed to turn over sufficient vending machine income to the Randolph–Sheppard program. Specifically, plaintiffs claim that from October 2, 1982 through October 2, 1986, GVMS collected nearly $510,000 in vending machine income, and they allege that 50% of this amount (or $255,000) should have accrued to the blind vendor program. Instead, the program received only $66,000.

Plaintiffs have not met their burden of showing that the District violated the Act by paying insufficient amounts to the Randolph–Sheppard program. The Act and regulations do not require the straight payment of 50% of vending machine income to the Randolph–Sheppard program, as plaintiffs claim. On several fronts, the statutory scheme is more complicated. First, vending machine companies such as GVMS are authorized to first deduct their management fees before computing the amount of income to be distributed to other concerns. *See* 20 U.S.C. § 107e(8) (defining "vending machine income" to mean receipts "after cost of goods sold (including reasonable service and maintenance costs)"). Second, where machines are not in direct competition with a blind vending facility, the amount of vending machine income paid to the program depends on whether employees work on the premises during periods other than normal working hours. 20 U.S.C. § 107d–3(b)(1); 34 C.F.R. § 395.32(c), (d). As defendants point out, many District buildings are staffed by employees around the clock. Herron Tr. 69 (day 5). Third, these provisions do not apply to income from vending machines which are not in direct competition with a blind vending facility where the total amount of income from an individual machine does not exceed $3,000 annually. *Id.* § 107d–3(d); 34 C.F.R. § 395.32(i). Finally, vending machine income from machines located in the District's federally financed public housing projects is generally exempt

from the Randolph–Sheppard program. *See* D–319, D–274 (Low–Rent Housing Accounting Handbook). Plaintiffs' allegation that the amount they received was insufficient fails to take into account these many factors.

34. In view of the complexity of the statutory scheme governing the distribution of vending machine income from government property, the Court concludes that the formula used by the District under its contract with GVMS, *see supra* Facts 54–55, was reasonable and in accordance with the Act. Plaintiffs put forth insufficient evidence to indicate otherwise. Accordingly, plaintiffs' request for damages arising from the contract between the District of Columbia and GVMS is denied.

*Vendor Training*

■ 35. Under the Randolph–Sheppard Act, DCRSA is required to ensure that effective training programs, including on-the-job training, upward mobility training, and follow-up services, are provided for blind individuals licensed to operate vending facilities in the District. As the Act states, Congress through this training requirement sought to ensure that the "maximum vocational potential" of each vendor would be achieved. 20 U.S.C. § 107d–4; 34 C.F.R. §§ 395.3(8), 95.11.

36. The evidence showed that the training provided to the vendors was sporadic, inconsistent, and not in compliance with the Act from 1985 until well after the complaint was filed. Since August 1989, however, DCRSA has employed a qualified training coordinator and has developed a training and upward mobility program which has been submitted to the BVC for its comments and revisions. At present, the Court finds no violations of the Act or its regulations.

■ 37. Plaintiffs do not seek damages for defendants' past violations of the Act's training requirements. Rather, they seek a writ of mandamus to compel defendants to adhere to the requirements of the Act. Mandamus is an "extraordinary remedy" to be used only in the most compelling cases, that is, where there is a clearly defined statutory duty that government of-

ficials are failing to perform. *13th Regional Corp. v. Department of the Interior,* 654 F.2d 758, 760 (D.C.Cir.1980) (citing *United States ex rel. McLennan v. Wilbur,* 283 U.S. 414, 420, 51 S.Ct. 502, 504, 75 L.Ed. 1148 (1931)). Moreover, a writ of mandamus will traditionally issue only when the imposed duty is "ministerial" in nature, which is a question of statutory interpretation. *Id.*

38. The Court finds that the evidence presented at trial is legally insufficient to justify the issuance of a writ of mandamus. Although DCRSA's provision of training services in the past was clearly inadequate, defendants are presently complying with the Act. It is perhaps true that plaintiffs' vocal and persistent protests coupled with this lawsuit served to set in motion that compliance. The Court's conclusion might be different if defendants, at the time of trial, still had not hired a training coordinator nor implemented a proposed training program and submitted it for review by the BVC. Under present circumstances, however, such extraordinary relief is not justified. Plaintiffs' request for mandamus is therefore denied.

*Vendor Participation*

■ 39. Under the Randolph Sheppard Act, DCRSA is required to ensure that the BVC's responsibilities include, in part, active participation with the SLA "in major administrative decisions and policy and program development," active participation "in the development and administration of a transfer and promotion system for blind licensees," and active participation "in developing training and retraining programs." 20 U.S.C. § 107b–1(3); 34 C.F.R. § 395.14(b). This statutory mandate means that the BVC should be more than just informed of decisions already made, but should be actively involved in the decisionmaking process.

40. Until recently, DCRSA's compliance with the participation requirements of the Act was inadequate. The evidence showed that DCRSA generally failed to respond to requests of the BVC. This failure was a proximate cause of many elements of plaintiffs' claims. Specifically, DCRSA's unilateral decision to terminate DEB was made notwithstanding the staunch and vocal opposition of the blind vendors. DCRSA's unilateral decision to contract with DAC was made without any input by the BVC. Finally, DCRSA's unilateral decision not to return the surplus levy identified as available in 1984 was made notwithstanding a demand by DEB on behalf of the blind vendors. There was no semblance of real participation or negotiation with respect to these decisions. These past violations of the Act, which resulted in financial injury to the blind vendors, are discussed above. The Court has already fashioned appropriate relief.

41. The evidence showed that since Katherine Williams has taken over as Acting Administrator of DCRSA, the BVC has been asked to participate in major program decisions to a much greater extent. The Court concludes that at the present time, defendants are complying with the participation requirements of the Act. Plaintiffs have presented no concrete evidence to suggest otherwise.[10] This Court is ill-equipped to issue prospective relief, in the form of mandamus or otherwise, in the absence of such concrete facts. Thus, plaintiffs' plea for relief with respect to this claim, to the extent that it is considered as distinct from plaintiffs' other claims, is denied.

*Award of Attorneys Fees*

■ 42. Plaintiffs request reasonable attorneys fees and costs as an element of their damages. Complaint at 17, ¶ 4. In

**10.** In their post-trial brief, plaintiffs point to several other examples to show that defendants are violating the participation requirements of the Act, including: (1) DCRSA's unilateral decision to develop large "emporia" vending facilities in 1985; (2) DCRSA's refusal to adopt the BVC's recommendations regarding departmental vending stands; and (3) DCRSA's exclusion of the BVC in the development of regulations to govern evidentiary hearings. Plaintiffs' Proposed Findings of Fact and Conclusions of Law, at 13–14. Even assuming that these actions violated the Act, there is no evidence that these violations are continuing. Instead, the evidence reflects that at the present time DCRSA is embracing the views of the BVC and soliciting its active participation, in compliance with the Act.

*Delaware Dep't of Health and Social Servs v. United States Dep't of Educ.*, 772 F.2d 1123 (3rd Cir.1985), the Third Circuit concluded that, as a matter of federal law, attorneys fees may be awarded in breach of contract actions between blind vendors and a state licensing agency under the Randolph–Sheppard Act. *Id.* at 1139. Specifically, the Court stated: "We conclude on balance that the undertaking of the states participating in the Randolph–Sheppard program is to make blind vendors whole for state breaches of contract, and that an award of attorneys' fees as contract damages is, in this unique circumstances, an appropriate means to that end." *Id.* (footnote omitted). This Court agrees with that analysis and holds that plaintiffs are entitled to recover reasonable attorneys fees in this case. *See also Almond v. Boyles*, 792 F.2d 451, 456–57 (4th Cir.1986) (upholding, without discussion, district court's award of attorneys fees in Randolph–Sheppard challenge, but remanding for recalculation). Plaintiffs shall file with the Court an accounting of their legal fees incurred in prosecuting this action from January 21, 1988 (the date the complaint was filed) to the date of this decision, and defendants shall file their opposition thereto, if any, in accordance with the dates established in the accompanying order.

*Remaining Issues Raised in the Complaint*

43. On December 13, 1989, several days before trial, plaintiffs filed a praecipe informing the Court that they would not prosecute the following issues: defendants' alleged failure to submit social security payroll taxes for sighted assistants of blind vendors; defendants' alleged wrongful continuation of departmental vending facilities and depletion of the reserve and stabilization fund; defendants' alleged failure to establish valid administrative review and full evidentiary hearing procedures; and defendants' alleged wrongful acts concerning the establishment of the large cafeterias, or "emporia." Since plaintiffs declined to prosecute these claims, they are accordingly dismissed.

44. Plaintiffs allege that defendants violated the Act and regulations by failing to ensure satisfactory sites for vending facilities. Complaint at 6–7, ¶ 10. The Court finds insufficient evidence to sustain this allegation. In addition, with respect to the establishment of sites on federal property, the Act seems to place the primary responsibility for identifying such sites on the federal property managers, who are not defendants in this action. *See* 20 U.S.C. § 107a(d)(1); 34 C.F.R. § 395.30(a); 42 Fed. Reg. 15802, 15807–08 (Mar. 23, 1977). In any case, since there was insufficient evidence presented at trial with respect to this claim, the Court denies relief.

45. Plaintiffs allege that defendants violated the Act and regulations by failing to implement a transfer and promotions policy. Complaint at 10, ¶ 20. Plaintiffs at trial failed to introduce any evidence to support this allegation. Accordingly, the Court denies relief with respect to this claim.

46. Plaintiffs allege that defendants violated the Act and regulations by requiring the present Nominee to hire unnecessary and unproductive personnel, thereby draining resources from the Nominee to the detriment of the vendors. Complaint at 12, ¶ 29. Except to the extent previously dealt with above, the Court finds insufficient evidence to support this general allegation and denies relief with respect to this claim.

### ORDER OF JUDGMENT

The Court having held a bench trial in this matter from December 18 to December 22, 1989, and having set forth its findings of facts and conclusions of law in the accompanying Memorandum, it is by the Court this 17th day of April, 1990,

ORDERED, ADJUDGED, AND DECREED that plaintiffs' request for damages be, and hereby is, granted. Defendants shall pay to plaintiffs damages in the amount of six hundred twenty thousand five hundred twenty six dollars and sixty-four cents ($620,526.64), plus post-judgment interest at the rate of 4 percent per annum, in accordance with D.C.Code § 28–3302(b). This amount shall be paid in

lump sum to the Committee of Blind Vendors of the District of Columbia, which shall distribute the funds, in accordance with the accompanying Memorandum, to the individual blind vendors that constitute the plaintiff class; and it is further

ORDERED, ADJUDGED, AND DECREED that in view of present circumstances, and for the reasons set forth in the accompanying Memorandum, plaintiffs' request for mandamus be, and hereby is, denied; and it is further

ORDERED, ADJUDGED, AND DECREED that plaintiffs' request for attorneys' fees be, and hereby is, granted. On or before May 10, 1990, plaintiffs shall file with the Court an accounting of their legal fees incurred in prosecuting this action from January 21, 1988 to the date of this decision. Defendants shall file their opposition papers thereto, if any, on or before May 21, 1990.